**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

DAVID L. JOHNSON, AIS 134016,          :

      Plaintiff,                                          :

vs.                                                            :          CA 11-0228-CG-C

PENTON ASHWORTH, et al.,               :

      Defendants.

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), on the motion for summary judgment filed by defendants Penton Ashworth, James Pate, Roger Marsh, and James English (Doc. 189; *see also* Doc. 190 (additional attached exhibits)), plaintiff's response in opposition (Doc. 199), and plaintiff's notice of filing substitute exhibit (Doc. 202). Upon consideration of the foregoing pleadings, the Magistrate Judge recommends that the Court **GRANT IN PART** and **DENY IN PART** the present motion for summary judgment.

## FINDINGS OF FACT

Plaintiff contends that to set the appropriate stage for what occurred to him at Holman Correctional Facility in Atmore, Alabama on December 31, 2010, this Court must necessarily begin by recounting defendant Kevin Dunn's employment history with the Alabama Department of Corrections ("ADOC") and others. By letter dated July 31, 2006, the ADOC offered Dunn "conditional employment as a Correctional Officer I effective **August 1, 2006**" and assigned him to Fountain Correctional Facility. (Doc. 199, Exhibit 24.) Dunn was specifically informed that he would be required "to serve a six-

month probationary period[,]" and following successful completion of same he would receive "permanent status as a Correctional Officer I." (*Id.*) Dunn completed all paperwork required for employment on August 1, 2006 (Doc. 199, Exhibit 30, at 1-3) and thus began his career as a Correctional Officer I with the ADOC. Dunn tendered a handwritten letter of resignation—accepted and acknowledged by Warden Jerry Ferrell on June 27, 2007—effective July 9, 2007 and therein requested that he be placed on the rehire list. (*See* Doc. 199, Exhibits 25 & 26.) In the official paperwork for the State of Alabama Personnel Department, Dunn's resignation was ultimately approved, as was the recommendation for reemployment. (Doc. 199, Exhibit 30, at 4.) Although the undersigned cannot say with absolute certainty why Dunn resigned effective July 9, 2007, it appears that his resignation relates, in part, to a 3-day without-pay suspension—effective June 14, 2007 through June 16, 2007—approved by the Commissioner of the ADOC based upon a November 8, 2006 "verbal altercation" Dunn had with another correctional officer relating to a "jacket." (*Compare id. with* Doc. 199, Exhibit 11.)[1] The June 1, 2007 letter from the Commissioner announcing to Dunn his 3-day suspension references consideration of infractions by Dunn (*see id.* at 2) consistent with matters discussed with Dunn during his November 6, 2006 mid-appraisal report (*compare id.* ("In determining the appropriate corrective action for the above violations, I have considered the following infractions: 1. Non-compliance with policies, procedures, and regulations. . . . 2. Disagreeable behavior, including lack of cooperation and

---

[1]     Dunn relayed a very different story than what is reflected in the Commissioner's letter regarding the November 8, 2006 altercation with another correctional officer. (*See* Doc. 199, Exhibit 2, Deposition of Kevin Dunn, at 96-100.) Dunn testified that he and a cadet were jogging on Fountain's track and talking about an upcoming high school football game between Hoover and Prattville. (*Id.* at 96-97.) According to Dunn, after he made what he considered to be appropriate use of the word "niggers," the African-American cadet, Sikes, punched him in the face. (*Id*. at 96-98.)

insubordination. . . . 3. Serious violations of rules, policies, procedures, regulations, laws, or reasonable conduct expectations. . . . 4. Fighting, assault, physical violence or disruptive behavior. (Administrative Regulation 208, Annex H, Number 25).") *with* Doc. 199, Exhibit 10 ("Officer Dunn has pending (1) suspension for fighting, assault, physical violence or disruptive behavior, (2) written reprimand – disagreeable behavior including lack of cooperation and insubordination (x2), [and] (3) Warning – Tardy – late for work (1st offense) pending (2[nd] offense)[.]")).[2]

Following his resignation from the ADOC, Dunn was almost immediately employed by the Atmore Police Department. (*See* Doc. 199, Exhibit 14.) The record supplied by plaintiff recounting Dunn's employment history reflects that the defendant was employed by the Atmore Police Department from July 16, 2007 through July 30, 2007 and again from August 27, 2007 through January 14, 2008, terminating his employment on both occasions by resignation. (*See id.*)  Although this employment history is somewhat curious, it is clear that Dunn ultimately resigned from the Atmore Police Department in January of 2008 because he "got into it" with a fellow officer. (*See* Doc. 199, Exhibit 2, Dunn depo., at 108-110.) Thereafter, Dunn did some contract "oil field" work for Parker & Sons in Atmore before going "back to the prison." (*See id.* at 111.)

Dunn's reemployment with the Alabama DOC began on October 1, 2008 (Doc. 199, Exhibit 14) and it appears that until his March 15, 2011 voluntary resignation he was at all times a Correctional Officer I at Holman Correctional Facility (*compare id. with id.,* Exhibit 19).  Dunn earned a reputation among inmates as a racist bully who targeted

---

[2]     Given that all of these infractions occurred during Dunn's probationary period of employment, it is reasonable to conclude that Dunn resigned because he was not going to gain permanent status as a Correctional Officer I with the Alabama DOC.

certain inmates for harassment (*compare, e.g.,* Doc. 199, Exhibit 4, Deposition of Ash-Shakur Shabazz, at 19 (Dunn was a bully who abused his authority) *with* Doc. 199, Exhibit 5, Deposition of Reginald Welch, at 17-18 (Dunn used excessive force on Johnson and while Welch never saw Dunn use excessive force against any other inmate, he did witness Dunn target certain black inmates for shakedowns and saw the correctional officer shut the hallway gate on black inmates and not let them pass through while allowing white inmates to pass through the hallway gate) *and* Doc. 199, Exhibit 6, Deposition of Kenyatta McMillian, at 15-16 (Dunn was a bully who had certain inmates he liked to pick on and who the witness saw try to "rough up" between 4 and 5 inmates)) and even a fellow correctional officer had "heard" rumors that Dunn was an aggressive employee who liked to fight (Doc. 199, Exhibit 3, Deposition of Penton Ashworth, at 84; *see also id.* at 85-87 (Ashworth heard about Dunn getting into a racially-motivated altercation/fight with a supervisor at Fountain and he had also heard about an incident transpiring at the Atmore Police Department "where he [Dunn] was separated from employment.")).

On November 10, 2010, inmate James Broadhead flooded his cell in the segregation unit and refused numerous orders to "cuff up" so that officers could strip his cell and clean up the water. (Doc. 190, Exhibit 23; *see also* Doc. 199, Exhibit 15.) After Broadhead refused several direct orders from Lieutenant James English to "cuff up," English informed the inmate he would be sprayed with the chemical agent Sabre Red if he did not do as instructed. (*Id.*) When Broadhead again refused to obey, English sprayed Broadhead in the facial area (through the tray hole door) with the chemical agent and Broadhead replied by throwing a liquid substance at English which hit the

officer in the groin area. (*Id*.) Thereafter, a cell extraction team[3] was assembled and after Broadhead again refused to comply with a direct order to "cuff up," the cell extraction team entered the recalcitrant inmate's cell and ultimately handcuffed and leg ironed Broadhead and took him to the Health Unit for assessment while his cell was stripped and cleaned and his water turned off. (*Id*.) What the incident report fails to reflect, however, is that during the cell extraction Dunn hit inmate Broadhead in the head (Doc. 199, Exhibit 2, Dunn depo., at 116-117)—an action which Ashworth witnessed (*compare* Doc. 189, Exhibit 9, Ashworth depo., at 94 (he saw Dunn hit the inmate in the head with his closed fist) *with* Doc. 199, Exhibit 9, Investigative Report, at 4 ("On 1-06-11 I interviewed Sgt. Ashworth. . . . Sgt. Ashworth also mentioned that Officer Dunn has been told not to hit inmates in the head. Officer Dunn has also punched another inmate, in a different incident."))—and was thereafter warned by Lt. James English not to hit inmates in the head (*compare* Doc. 199, Exhibit 3, Ashworth depo., at 95-96 (Lt. English told Ashworth that he specifically told Dunn not to hit inmates in the head) *with* Doc. 199, Exhibit 2, Dunn depo., at 117-118 (although witness was sure Ashworth did not tell him not to hit inmates in the head, following the Broadhead cell extraction, he could not recall whether he was warned by some other correctional officer not to hit inmates in the head)).

On December 31, 2010, David L. Johnson was incarcerated at Holman Correctional Facility in Atmore, Alabama under the custody and control of the Alabama Department of Corrections ("ADOC"). (*Compare* Doc. 189, Exhibit 2, Deposition of David L. Johnson, at 11 *with* Doc. 199, Exhibit 9, Investigative Report, at 1 (subject of

---

[3]     The cell extraction team included Penton Ashworth as the shield man and Kevin Dunn who was responsible for Broadhead's left leg. (*Id*.)

report was allegation of excessive force at Holman Correctional Facility involving Johnson on December 31, 2010).)[4] Sergeant Penton Ashworth testified that he received an order from the medical staff that morning instructing that Johnson be placed in "medical hold" and after receiving that order from Nurse Hicks around 11:00 a.m. (and the medical staff, in turn, purportedly confirming same with the doctor) and finding out that Johnson was to be placed into medical hold because of a problem with his blood sugar, Ashworth radioed for plaintiff to be brought to the shift commander's office on the main hall. (*See* Doc. 189, Exhibit 9, Ashworth depo. at 13, 15 & 17; Doc. 199, Exhibit 3, Ashworth depo., at 14.)[5] At approximately 11:15 a.m., defendant Dunn went to plaintiff's cell block in general population and informed Johnson that because his blood sugar was high (over 400) he needed to report to the shift office to see defendant Penton Ashworth. (*Compare* Doc. 189, Exhibit 2, Johnson depo., at 11 *with* Doc. 189, Exhibit 10, Dunn depo., at 43 *and* Doc. 202, Exhibit 1, Declaration of David Johnson, at ¶ 6; *see* Doc. 189, Exhibit 9, Ashworth depo., at 18 ("I advise[d] Inmate Johnson that he needed to go to medical hold per orders of the medical staff.").) Upon arriving in the hallway outside the shift office, Ashworth informed Johnson that he was going to be sent to a one-man

---

[4]     Johnson, a medium custody inmate, is presently incarcerated at William E. Donaldson Correctional Facility. (Doc. 189, Exhibit 1.) Between November 27, 2000 and July 11, 2011, the date of his deposition, Johnson received approximately thirty-six (36) disciplinaries. (*Compare* Doc. 189, Exhibit 2, Deposition of David L. Johnson, at 75 *with id*, Exhibit 4.)

[5]     "James English was not at the Holman Correctional Facility and was not assigned to work on December 31, 2010." (Doc. 190, Exhibit 22, Affidavit of Tony Patterson at 1; *see also* Doc. 190, Exhibit 15, Holman's Shift Roster for December 31, 2010 (does not contain English's name).)

holding cell on death row (in the "Q-unit")[6] and isolated from the general population. (*Compare* Doc. 189, Exhibit 2, Johnson depo., at 11 *with* Doc. 202, Exhibit 1, Johnson decl., at ¶ 6.) Johnson was confused by Ashworth's statement because he had never been sent to the Q-unit for high blood sugar and had never heard of any inmate with a non-contagious disease going to the Q-unit (*see id.*);[7] therefore, since it was apparent to Johnson that he was not going to be seen immediately by the medical staff he asserted his "legal right" to decline medical treatment and told Ashworth he wanted to sign the appropriate paperwork so that he could refuse medical treatment and return to general population. (*Compare* Doc. 202, Exhibit 1, Johnson decl., at ¶¶ 6-7 *with* Doc. 189, Exhibit 2, Johnson depo., at 12.) Ashworth informed Johnson that he did not have the right to sign a medical form and refuse medical treatment, after which the two men began to argue over whether Johnson had the right to refuse treatment. (*Compare id.* at 12-13 *with* Doc. 202, Exhibit 1, Johnson decl., at ¶ 7.) As the two men argued, Ashworth drew his canister of chemical agent (*id.*) and told Johnson that one way or another he was going to a death row cell (Doc. 189, Exhibit 2, Johnson depo., at 12-13).[8]

---

[6]     One deposed inmate described the "Q-unit" as an area with smaller, filthier single-man cells than the other one-man cells in segregation which the prison staff checks infrequently. (Doc. 199, Exhibit 5, Welch depo., at 26.)

[7]     Indeed, Ashworth's testimony is not contrary to that of Johnson, the witness specifically stating that the "Q-unit" is primarily dedicated to inmates with medical problems who require observation and separation from the general population. (Doc. 189, Exhibit 9, Ashworth depo., at 18.) Ashworth also admitted that some inmates being processed into segregation are placed "momentarily" into the "Q-unit." (*Id.* at 18-19.)

[8]     It is Ashworth's position that Johnson was disobeying a direct and lawful order and that in order to seek the inmate's compliance with that order, he used the minimum amount of force necessary to gain control of the situation, that is, chemical spray and handcuffs. (Doc. 189, Exhibit 9, Ashworth depo., at 98.) The lawfulness of Ashworth's order, of course, is wrapped up in the communications Ashworth had with the medical staff. (*See* id. ("I was ordered to place him in [] medical hold, advised him that's where he needed to go, and he said he wouldn't.").) However, there is no direct testimony from either the doctor who allegedly gave the order to move Johnson to the "Q-unit" or the nurse who purportedly received that (Continued)

Feeling closed in and cornered by the six correctional officers/cadets outside the shift commander's office, Johnson told Ashworth and the others that "whatever they planned to do to [him] in Q-unit they could go ahead and do to [him] on the hallway." (Doc. 202, Exhibit 1, Johnson decl., at ¶ 9; *see also* Doc. 189, Exhibit 2, Johnson depo., at 13.)[9]  Without warning or provocation (*compare* Doc. 202, Exhibit 1, Johnson decl., at ¶ 9 *with* Doc. 189, Exhibit 2, Johnson depo., at 13; *see also* Doc. 190, Exhibit 13, Welch depo., at 7 ("Next thing I know . . . Lieutenant Ashworth reached and grabbed his . . . can and started spraying it. Diabetic Moe picked up the chair . . . ."); *but cf.* Doc. 189, Exhibit 9, Ashworth depo., at 25-26 (he did not spray plaintiff until after Johnson picked up the stool and he told the inmate to "halt")), Ashworth sprayed Johnson in the face with a chemical agent called Sabre Red (*see id.* at 25 (Ashworth identified the chemical agent as Sabre Red)).[10] Johnson backed up against the wall and as Dunn also began to spray him with the chemical agent, plaintiff felt a wooden stool by him and picked it up to shield

---

order from the doctor and relayed same to Ashworth that someone in Johnson's medical condition not only could be placed in the "Q-unit" but, as well, could not sign a form refusing such "medical treatment/move." And while it is clear that "[u]nder the federal rules, [h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules[,]" *Clark v. APAC Mid-South, Inc.*, 2012 WL 6186012, *15 n.15 (N.D. Ala. Dec. 6, 2012) (internal quotation marks omitted; citations omitted), the defendants do not set forth the exceptions to which the alleged statements of the doctor and nurse conform.

[9]      Johnson did not tell the correctional officers to "Bring it on." (Doc. 202, Exhibit 1, Johnson declar., at ¶ 9; *but cf.* Doc. 189, Exhibit 10, Dunn depo., at 49 (officer's testimony that Johnson told them that they were going to have to drag him, to "bring it on," and he picked up a wooden chair and started swinging it).)

[10]      Administrative Regulation 312 provides that chemical agents are to be used only to gain or regain control of a situation once other lesser methods on the use of force continuum are unsuccessful or have been determined to be ineffective and only after the giving of a verbal warning prior to discharge of the chemical agents. (Doc. 199, Exhibit 21, at 3.) In addition, the regulation provides that chemical agents shall be used only for self-defense against physical assault, defense of other staff, the general public, or other inmates, and when an inmate exercises physical resistance to a lawful command. (*Id.* at 4.)

his face from the Sabre Red; he did not use the stool as a weapon or attempt to hit the
correctional officers with the stool. (Doc. 202, Exhibit 1, Johnson decl., at ¶ 9; *see also*
Doc. 189, Exhibit 2, Johnson depo., at 13; *see* Doc. 190, Exhibit 13,  Welch depo., at 9-10
(first time Ashworth sprayed Johnson, Johnson did not have the wooden stool in his
hand; plaintiff was just trying to go into the shift commander's office but he did pick up
the stool after he was sprayed and began swinging it in a sideways motion in front of
his face to block the mace, not to hit the officers); Doc. 199, Exhibit 4, Shabazz depo., at
13 (stool was being used by Johnson to defend against the mace coming at his face, not
for assaultive purposes); Doc. 199, Exhibit 8, Deposition of James Earl Pittman, at 11-13
(Johnson had the stool in front of his face to shield it from the spray; he was not using
the stool in a threatening manner, as he did not lunge at the officers or push or shove
the stool at the officers); *but cf.* Doc. 189, Exhibit 9, Ashworth depo., at 27-28 (plaintiff
was swinging the stool toward the officers and even had it above his head at one point;
it appeared to Ashworth that Johnson was going to use the stool against one of the
officers).) Once the officers stopped spraying Johnson, it being admitted by Ashworth
that he sprayed Johnson twice (*see* Doc. 189, Exhibit 9, Ashworth depo., at 29 & 33; Doc.
199, Exhibit 5, Welch depo., at 8-9 (Ashworth sprayed plaintiff "[a]t least twice.")),
plaintiff dropped the stool on the ground (Doc. 202, Exhibit 1, Johnson decl., at ¶ 9; *see
also* Doc. 189, Exhibit 2, Johnson depo., at 13).

Immediately upon Johnson dropping the stool, he was tackled by the defendants,
including Ashworth (Doc. 189, Exhibit 9, Ashworth depo., at 33 (witness grabbed
plaintiff's right arm and helped take him to the ground)), and pinned to the ground in
such a manner that he was on his stomach and his hands were behind his back (*compare
id. with* Doc. 189, Exhibit 2, Johnson depo., at 16 *and* Doc. 202, Exhibit 1, Johnson decl., at
¶ 10; *see* Doc. 189, Exhibit 5, Affidavit of James Pate, at 2 (he assisted in taking Johnson

to the floor and handcuffing the inmate); Doc. 189, Exhibit 6, Affidavit of Roger Marsh, at 1-2 (Marsh witnessed Ashworth take Johnson to the ground and he assisted in seeing that plaintiff was handcuffed).) Plaintiff offered no resistance and after the defendants handcuffed Johnson and while he was still on the ground, defendant Dunn stood up, reared back, and kicked plaintiff in the left eye at least once (Doc. 202, Exhibit 1, Johnson decl., at ¶ 10; *see also* Doc. 189, Exhibit 2, Johnson depo., at 16; Doc. 190, Exhibit 12, Shabazz depo., at 15 (Dunn kicked Johnson really hard); Doc. 190, Exhibit 17, McMillian depo., at 21 (witness stands by his affidavit statements that after plaintiff was cuffed, Dunn got up off the floor and kicked Johnson in the eye)), if not two or three times (*compare* Doc. 190, Exhibit 13, Welch depo., at 12 (Dunn kicked plaintiff at least twice) *with* Doc. 199, Exhibit 6, McMillian depo., at 7 (Dunn kicked plaintiff two to three times). Dunn then knelt on Johnson's neck and punched plaintiff with his closed fist. (*Compare* Doc. 190, Exhibit 12, Shabazz depo., at 11 & 15 *with* Doc. 199, Exhibit 9, January 20, 2011 Investigative Report of Kelley Smith, at 7 (investigator's conclusion that Dunn kicked Johnson and then knelt down and hit the inmate with a closed fist).)

Despite the trauma to Johnson's left eye and the directive in Administrative Regulation 312 that "[p]ersons exposed to chemical agents **shall** be given *immediate* medical attention[,]" (Doc. 199, Exhibit 21, at 4 (emphasis supplied)), once plaintiff was picked up off the floor he was first taken to the shift office for a few minutes and then placed in a holding cell for 10 to 15 minutes before Correctional Officers Graham and Moody took him to the prison infirmary for a body chart (Doc. 189, Exhibit 2, Johnson depo., at 18-20; *compare id. with* Doc. 189, Exhibit 7, Affidavit of Jeffrey Cantey, at 2 (Johnson was placed in the holding cell for less than 20 minutes)). According to Cantey, Johnson was placed in the holding cell to await medical treatment because one of the two examination rooms in Holman's small Health Care Unit was occupied by an inmate

receiving a breathing treatment and the other was occupied by Ashworth who was being decontaminated. (*See id*. ("It is also a policy at Holman Prison that, in the event of an altercation between an inmate and an officer, in which the initial treatment appears to be similar and non-life threatening, the officer gets treated first so that he is able to return to his post.").) Johnson ultimately got his "Body Chart," which revealed: moderate swelling of the left eye; left pupil not responding to light; and plaintiff's inability to read the eye chart. (Doc. 189, Exhibit 8, at 1.) The notes on the chart reflect that Dr. Barber was notified of the condition of Johnson's eye and the doctor ordered an ice pack, instillation of what appear to be eye drops, and ordered that plaintiff be rechecked again in two hours. (*See id*.)

While Johnson was being checked by Holman's medical staff, all the officers and cadets named as defendants in this action (i.e., Pate, Marsh, Mummert, Bell, Ashworth, and Dunn) decided to cover-up the fact that Dunn caused the trauma to Johnson's left eye by kicking and hitting him. (*Compare* Doc. 199, Exhibit 9, Investigative Report, at 7 & 8 ("Sgt. Ashworth was clear that he knew Officer Dunn had punched the inmate, but still put in his own report that Officer Dunn used a brachial stun and allowed Officer Dunn to falsify his report. . . . This is also true with all of the officers involved and interviewed. The officers were well aware that unnecessary force was used by Officer Dunn and failed to report the offense in their reports.  . . . The two cadets, Cadet Mummert and Cadet Bell, clearly lied in their statements. They were over heard by a fellow officer talking about how they saw Officer Dunn kick the inmate. These two are cadets that are showing they are dishonest and will aid in covering up a wrongful act.") *with* Doc. 190, Exhibit 14, Incident Report (reflecting Dunn's statement that he attempted to strike Johnson with a "brachial technique" but that the inmate moved causing Dunn to strike Johnson in his left eye) *and* Doc. 199, Exhibit 2, Dunn depo., at 64

(Dunn initially told the investigator that he attempted to use a brachial technique because Ashworth told him to tell her that in order to keep both of them from getting into trouble).) The subsequent re-check of Johnson's eye by the prison medical staff convinced them that plaintiff's injury needed outside attention because he was transported to North Baldwin Infirmary in Bay Minette, Alabama and admitted at 3:44 p.m. complaining of eye pain; a CT scan of plaintiff's facial bones and C-spine were obtained. (Doc. 199, Exhibits 31 & 33; *see also* Doc. 199, Exhibit 16, Johnson depo., at 45 (nurse gave plaintiff some cream to use because he was still burning all around the back of his neck and his shoulder area from the chemical agent)[11].) Later still that day, specifically at 8:38 p.m., plaintiff was admitted to Mobile Infirmary Medical Center in Mobile, Alabama for treatment of his left eye injury. (Doc. 199, Exhibit 32.)

On January 4, 2011, Johnson was treated by Dr. John A. Jones, an ophthalmologist in Montgomery, Alabama. (*Compare* Doc. 190, Exhibit 20, Deposition of Allen Jones, M.D., at 6, 8 & 10-11 *with* Doc. 189, Exhibit 8, at 4.) Jones' January 4, 2011 examination of plaintiff's left eye revealed a traumatized eye with cells flared and a murky-looking anterior of the chamber and 20/100 corrected vision for distance; Jones found no foreign body in the eye, no corneal defect, and no damage to the lens. (Doc. 190, Exhibit 20, Jones depo., at 11-16.)[12] Jones treated the inflammation of the eye (iritis)

---

[11]    Although Johnson's Body Chart from Holman reflects that his eyes were decontaminated, nothing on the chart reflects that plaintiff was given anything because of the burning on his neck and shoulder area caused by the chemical agent. (*Compare id. with* Doc. 189, Exhibit 8, at 1.) However, the medical records from North Baldwin Infirmary reflect that Silvadene Cream was applied to Johnson's posterior neck. (Doc. 199, Exhibit 33.)

[12]    Although plaintiff has supplied to this Court a record obtained from Dr. Jones' office that purports to be a record of an eye examination performed by Jones on him and dated October 18, 2005 (Doc. 199, Exhibit 34, at 1 & 5), that report of eye examination by Jones actually relates to another inmate, David Aaron Johnson, then a 20-year-old white male (*id*. at 1).

by dilating the eye and putting it at rest and using topical steroid drops to fight the inflammation; Johnson was given shades, a prescription for the eye drops, and told to return in a week. (*See id*. at 17-18.) Johnson returned to Jones on January 11, 2011 and although his corrected vision in the right eye was noted to be 20/20 his corrected vision in the left eye remained at 20/100. (*Id*. at 18.) Jones observed that plaintiff was responding nicely to treatment; in fact, although Jones kept Johnson on the eye drops that kept his eye at rest by keeping his pupil from constricting, he stopped the steroidal eye drops. (*Id*. at 19.) Jones noted Johnson's lens was clear—with no mention of a cataract—and he also found no signs of retinal problems due to diabetes. (*Id*. at 19-20.) Johnson returned to Jones one last time on February 3, 2011; the inmate's iritis was resolved so Jones stopped all eye drops. (*Id*. at 20-21.) Jones noted that Johnson's eye was still dilated but could not say whether that was from the medicine or the initial trauma; he discontinued the shades and told Johnson to return to him as needed. (*Id*. at 21-22.)

The day after Johnson first was treated by Dr. Jones, that is, on January 5, 2011, Kelley Smith, an investigator with the Investigation and Intelligence Division of the ADOC, was assigned to investigate "allegations of excessive force by Officer Kevin Dunn against inmate David Johnson[.]" (Doc. 199, Exhibit 9, at 1 & 8.) During her approximately two-week investigation, Smith interviewed numerous officers, medical staff, and inmates at Holman, including all named defendants with the exception of James English (that is, Cadets Mummert and Bell, and Correctional Officers Pate, Marsh, Ashworth, and Dunn). (*See id*. at 2-7.) Importantly, Smith's investigation not only substantiated "the allegations that Officer Dunn used excessive force" (*id*. at 2) but, as well, revealed that all officers involved falsified their reports by not reporting Dunn and/or lied in their reports to cover-up Dunn's misdeeds (*see id*. at 7-8).

13

After interviewing those involved with the incident pertaining to inmate Johnson it is clear excessive force was used by Officer Dunn. Although he denies kicking the inmate, he was untruthful in his original statement and report. Officer Dunn in fact stated he punched the inmate with a closed fist, while he was face down on the ground, either being cuffed or already cuffed in his second statement. The blunt force trauma to inmate Johnson's eye goes beyond a single strike. The injury indicates inmate Johnson was kicked in the eye. The witnesses clearly saw Officer Dunn kick the inmate, and then kneel down, at which time Officer Dunn hit inmate Johnson [with a] closed fist in the face.

Sgt. Ashworth was clear that he knew Officer Dunn had punched the inmate, but still put in his own report that Officer Dunn used a brachial stun and allowed Officer Dunn to falsify his report. Sgt. Ashworth went on further to say he feels like Officer Dunn kicked inmate Johnson, but failed to report this. As the Sergeant handling this incident he had a duty to be truthful and make sure Officer Dunn was truthful in his report before he approved it.

This is also true with all of the officers involved and interviewed. The officers were well aware that unnecessary force was used by Officer Dunn and failed to report the offense in their reports. This is supported by Officer Dunn's own statement as he admits that he, Sgt. Ashworth and the other officer[]s involved were in a discussion[] [regarding] the best scenario to put in the report. Officer Dunn stated they were in the shift officer after the incident. This discussion took place because they found out inmate Johnson was sent out to a free world hospital.

The two cadets, Cadet Mummert and Cadet Bell, clearly lied in their statements. They were over heard by a fellow officer talking about how they saw Officer Dunn kick the inmate. These two are cadets that are showing they are dishonest and will aid in covering up a wrongful act.

In conclusion, the allegation that Officer Dunn used excessive force is substantiated.

(*Id.*)[13]  Indeed, Ashworth testified that once an inmate is on the ground there is no need

to kick or hit the inmate in the head. (Doc. 199, Exhibit 3, Ashworth depo., at 96; *see also*

---

[13]     Administrative Regulation 327 lists chemical agents as a type of force that may be utilized (Doc. 199, Exhibit 22, at 4); defines excessive force as "[t]he amount of force which is beyond the need and circumstances of the particular event, or which is not justified in light of all of the circumstances[,]" (*id.* at 2); and provides that the application of physical force "[m]ust be reasonable and necessary under the circumstances[,] . . . [s]hall be only the minimum amount necessary to control the situation or achieve a legitimate correctional objective[,] . . . [s]hall never be used as punishment[,] . . . [s]hall be dependent upon the inmate's action or non-
(Continued)

Doc. 189, Exhibit 9, Ashworth depo., at 100 (once plaintiff was on the ground and was not putting up any resistance, he should not have been struck).)

Administrative Regulation 208 governs Employee Standards of Conduct and Discipline. (Doc. 190, Exhibit 24.) This regulation specifically provides that employees "shall **not**" abuse inmates in any manner and that in applying physical force to an inmate, such force shall only be "to the degree that is reasonably necessary in self-defense, to prevent an escape, to prevent an injury to a person or the destruction of property, to quell a disturbance, or to restrain an inmate who exercise physical resistance to a lawful command." (*Id*. at 5 & & 6.)[14] There can be little doubt that the investigative findings made by Kelley Smith on January 20, 2011, and Dunn's clear violation of Administrative Regulation 208, led to Dunn tendering his resignation on March 15, 2011. (*Compare* Doc. 199, Exhibit 19 *with id.*, Exhibits 9 & 26.)

## SAMPLE:  RESIGNATION FROM EMPLOYMENT

---

action[,] . . . [s]hall be determined on a case by case basis and the employee using or authorizing force will be required to justify the action taken[,] . . . [and w]ill stop when resistance offered by the inmate ceases and the inmate is under control and placed in appropriate restraints." (*Id*. at 3.)

[14]      Annex H to Administrative Regulation 208 is a Table of Infractions and Level of Discipline. (*See, e.g.,* Doc. 190, Exhibit 14, Annex H, at 1-6.) When Dunn was first employed by the ADOC at Fountain Correctional Facility, and for some period of time during his second period of employment with the ADOC at Holman Correctional Facility, Annex H provided that fighting, assault, and physical violence or disruptive behavior (Infraction #25) would result in a 5-day suspension on first occurrence, a 15-day suspension on a second occurrence, and dismissal upon a third infraction. (*See* Doc. 199, Exhibit 27, Annex H, at 1.) During this period of time, Annex H also provided that abusive or excessive physical force in dealing with inmates would result in a 5-day suspension on first occurrence and dismissal upon any subsequent violation. (*See id*. at 2.) Annex H was revamped in 2009 to provide a three-day suspension on first occurrence of either of the foregoing infractions and dismissal upon a second occurrence of either infraction. (*See* Doc. 190, Exhibit 14, Annex H, #s 29 & 30, at 3 & 4.)

> In accordance with Department of Corrections Administrative Regulation 208, I do hereby waive my rights to a Pre-Dismissal Conference and resign my employment with the Alabama Department of Corrections effective immediately.
>
> This resignation is not made as a result of any coercion, duress, threat, or promise. I was offered a pre-dismissal conference under the provisions of Department of Corrections Administrative Regulation 208.
>
> I understand that with this voluntary resignation it is highly probable that I will not be recommended for reemployment with the Department of Corrections.

(Doc. 199, Exhibit 19.) Dunn's resignation was received and accepted by Holman Warden Tony Patterson at 12:25 p.m. on March 15, 2011. (*Id.*) The following day, March 16, 2011, Warden Patterson signed a Recommendation for Personnel Action; this document not only notes Dunn's resignation but also contains the recommendation that Dunn not be considered for reemployment with the ADOC. (Doc. 199, Exhibit 26.) The Commissioner of the Alabama Department of Corrections, Kim Thomas, responded to the March 21, 2011 inquiry of the Director of Alabama's Personnel Division regarding whether he approved the "'no'" reemployment recommendation regarding Dunn (*see* Doc. 199, Exhibit 29) by signing the Recommendation for Personnel Action on March 24, 2011 (*see* Doc. 199, Exhibit 26).

On October 7, 2011, while housed at Donaldson Correctional Facility, Johnson was examined by an optometrist, Michael Hooks, O.D. (Doc. 190, Exhibit 21, Deposition of Michael Hooks, at 9.) Hooks saw no inflammation but did note an early cataract in Johnson's left eye. (*Id.* at 12.)[15] When Hooks saw Johnson again on March 19, 2012, the

---

[15]     A cataract is "an opacity or discoloration of the lens[.]" (Doc. 190, Exhibit 20, Jones depo., at 24.)

optometrist diagnosed a nuclear cataract[16]—a cataract to the central part of the lens—
and noted the cataract was diffuse, meaning the lens was turning "yellowish." (*Id*. at
14.) Although Hooks could not determine the cause of the cataract (*id*.), he testified that
a kick to the left eye which damaged the lens, that is, caused iritis, would be the type
trauma that could well have caused the cataract (*see id*. at 15-18; *see also id*. at 20
("[G]oing by your hypothetical that the injury caused the iritis, then it's possible that the
cataract certainly was caused by the injury[.]")). Hooks also admitted that given the fact
that the 50-year-old plaintiff's right eye was clear and the right lens was okay it "would
make it more likely to believe" the cataract was caused by trauma to the left eye. (*Id*. at
26.)   Dr. Jones, in turn, testified that traumatic cataracts develop much more slowly
than, for instance, diabetic cataracts, and there is gradual worsening (Doc. 190, Exhibit
20, Jones depo., at 27), such that it would be his opinion that plaintiff's development of
a cataract approximately one year after "trauma to an eye is consistent with the trauma
being a significant factor in the cataract formation." (*Id*. at 41.) Finally, although Dr.
Jones' testimony was clear that treatment for a "visually significant cataract" is surgery
(*id*. at 28), Hooks' testimony was equally clear that Johnson's corrected vision in the left
eye (20/30) on March 19, 2012 would not make him a candidate for cataract surgery
even in the free world (Doc. 190, Exhibit 21, Hooks depo., at 21 & 24). Although perhaps
not a candidate for surgery, the cataract does cause plaintiff blurred vision. (*Compare*
Doc. 189, Exhibit 2, Johnson depo., at 44 *with* Doc. 199, Exhibit 36.)[17]

---

[16]     Hooks admitted that he has seen trauma induce a nuclear sclerotic cataract. (Doc.
190, Exhibit 21, Hooks depo., at 21-22.)

[17]     It appears that Johnson's uncorrected vision in his left eye was 20/200 on August
9, 2012. (Doc. 199, Exhibit 36.) An Examination Sheet from Kilby Correctional Facility reveals
that Johnson was seen by an optometrist on January 2, 2013; the optometrist noted Johnson's
mild cataract and gave him a prescription for Pred Forte eye drops. (Doc. 189, Exhibit 8, at 5.)

Alabama's General Liability Trust Fund is, at present, defending Penton Ashworth, Roger Marsh, and James Pate (and, presumably, James English) under a reservation of rights. (*See* Doc. 199, Exhibit 20.) "The Fund's coverage applies only to occurrences caused by or resulting from negligent or wrongful acts or omissions in performance of a Covered Employee's official duties in the line and scope of employment with the State of Alabama." (*Id.* at 1.)

While none of the relevant defendant officers believe they could have done anything to prevent Dunn's assault of Johnson (*compare* Doc. 189, Exhibit 5, Pate aff., at 2 ("Even if I had seen something to indicate that former Officer Dunn was about to kick or hit Inmate Johnson, I could not have gotten up off the floor in time to physically stop him.") *with id.*, Exhibit 6, Marsh aff., at 2 ("Even if I had seen what I believed was an act of aggression from former Officer Dunn,[18] I could not have gotten up off of the floor, went around the other officers who were handcuffing Johnson, and stopped former Officer Dunn from kicking Inmate Johnson."( footnote added)) *and* Doc. 199, Exhibit 23, Affidavit of Penton Ashworth, at 2 ("[E]ven if I had heard former Officer Dunn threaten to harm Johnson, I was so incapacitated [by the pepper spray] that there is nothing physically I could have done to stop him.")),[19] and even plaintiff begrudgingly concedes

---

[18]     The undersigned finds curious that none of the correctional officers involved in the incident acknowledge seeing Dunn  kick or hit Johnson, whereas the inmate witnesses—all of whom were not as close to Johnson as were the officers—saw Dunn kick and/or hit Johnson.

[19]     Ashworth's affidavit statement that he "never heard anything which would indicate that he [Johnson] was about to be hit or kicked[,]" (Doc. 189, Exhibit 3, Ashworth aff., at 2) appears a bit inconsistent with his sworn deposition testimony that although he could not see "he could hear[.]" (Doc. 189, Exhibit 9, Ashworth depo., at 36 (says he heard officers trying to get handcuffs on Johnson and heard the inmate grunt and exclaim, "You didn't have to hit me[.]").) The undersigned is struck by Ashworth hearing a grunt from Johnson but his apparent inability to hear that which was heard by at least one inmate witness, namely the distinct sounds of one individual hitting another individual. (*See, e.g.,* Doc. 190, Exhibit 16, Deposition of Eric T. Person, at 27.)

(Continued)

the officers could have done nothing to prevent Dunn's initial kick (*see* Doc. 189, Exhibit 2, Johnson depo., at 48; *compare id. with* Doc. 190, Exhibit 11, Pittman depo., at 28 (no one was aware Dunn was going to kick Johnson given that plaintiff was handcuffed on the ground)), it is plaintiff's position, supported by the testimony of a fellow inmate, that the officers could have stopped Dunn's continued assault (*compare* Doc. 189, Exhibit 2, Johnson depo., at 48 & 59-63 *with* Doc. 190, Exhibit 12, Shabazz depo., at 15-16 (Ashworth, for one, saw what Dunn was doing to Johnson and while he could not have stopped the kick, Ashworth could have stopped Dunn from punching plaintiff); *see* Doc. 202, Exhibit 1, Johnson declar., at ¶ 11 ("Instead of lifting me up off the ground to my feet, Ashworth, Pate, Bell and Mummert forcefully held me down as Dunn stood up and kicked me. None of the officers did anything to intervene while I was assaulted. No officer physically restrained Dunn. No officer ordered him to stop. No officer said

_____

The undersigned also finds curious (and actually, "incredible" at this stage of the proceedings) Ashworth's affidavit and deposition testimony that he was totally "blinded" or "incapacitated" by the pepper spray (*compare* Doc. 189, Exhibit 3, Ashworth aff., at 2 *with id.,* Exhibit 9, Ashworth depo., at 34), given his clear testimony that he came in contact with the pepper spray in taking Johnson to the ground (*see id.* at 33) and evidence in the record indicating that other officers, including Dunn, were involved in taking Johnson to the ground but had no ill effects whatsoever from the chemical agent (*compare* Doc. 189, Exhibit 10, Dunn depo., at 55-56 (although Dunn testified Ashworth was not involved in taking Johnson to the floor, he testified that he was instrumental in taking the inmate to the floor, with an assist from Pate and Marsh, but makes no mention of coming in contact with the chemical agent in taking Johnson to the floor) *with* Doc. 189, Exhibit 5, Pate aff., at 2 (he assisted other officers in placing Johnson on the floor and was focusing on handcuffing the inmate but clearly did not come in contact with the chemical agent in doing so because his sole comment is that "[o]nce handcuffed, Inmate Johnson was taken away, presumably for decontamination and I did not *see* him again." (emphasis supplied)). While Ashworth may have come into some contact with the pepper spray (*see* Doc. 190, Exhibit 12, Shabazz depo., at 27 (inmate witness could not hide a bit of surprise when told during questioning that Ashworth had Mace in his eyes but stated that was "possible."); *compare id. with* Doc. 190, Exhibit 13, Welch depo., at 28 ("[H]e Maced his ownself *if* Sergeant Ashworth were maced." (emphasis supplied)), there is nothing in the record to bolster Ashworth's testimony that he was "totally" incapacitated by the pepper spray, as at least one inmate testified Ashworth saw Dunn kick and hit plaintiff (Doc. 190, Exhibit 12, Shabazz depo., at 15-16) and the correctional officer certainly managed to direct the following comment to Johnson while on the floor: "You brought [this] on yourself." (Doc. 190, Exhibit 13, Welch depo., at 14.)

anything at all to attempt to stop Dunn from assaulting me. All the officers were within a few feet of Dunn as he assaulted me. All of the officers were certainly within earshot of Dunn and could have told him not to assault me, or to stop after the assault began. Instead, they held me down and facilitated Dunn's assault on me.")).[20]

Johnson asserts six causes of action against the defendants in his amended complaint (Doc. 111, at 6-12), as follows:

### COUNT I

### (EXCESSIVE FORCE)

.       .       .

31.     Defendants, acting under the color of state law, violated Plaintiff's rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments by using force maliciously and sadistically to cause harm. Defendant Ashworth sprayed Plaintiff twice with Sabre Red without warning, provocation, or reason. Defendant Dunn kicked and punched Plaintiff in the head, while Plaintiff was handcuffed on the ground.

32.     As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

33.     Defendants knowingly, willfully, and recklessly disregarded Plaintiff's constitutional rights.

WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

---

[20]     The undersigned need note that Marsh's affidavit statement that he was holding Johnson's legs while he was being handcuffed and at no time saw anyone hit or kick plaintiff (Doc. 189, Exhibit 6, Marsh aff., at 2) stands in stark contrast to Johnson's sworn testimony that the correctional officer was standing and looking at Dunn kick him (Doc. 189, Exhibit 2, Johnson depo., at 59).

## COUNT II

## (FAILURE TO INTERVENE AND DELIBERATE INDIFFERENCE)

.        .        .

35.    Defendants Ashworth, Bell, Marsh, Mummert and Pate were present for and witnessed the excessive force applied to Plaintiff, yet they failed to take steps to protect Plaintiff. Defendants Ashworth, Bell, Marsh, Mummert and Pate did nothing to discourage the excessive force, even though they had a realistic opportunity to do so.

36.    Defendants failed to report the incident in violation of ADOC's regulations.

37.    Defendants had a duty to intervene when Ashworth and Dunn began using excessive force. Defendants consciously chose not to intervene or take any reasonable steps to protect Plaintiff and, as such, they are liable for nonfeasance.

38.    By allowing Dunn, who had a known proclivity toward violence, to kick and punch Plaintiff while he was restrained and on the ground, Defendants Ashworth, Bell, Marsh, Mummert and Pate were deliberately indifferent to the resulting substantial risk of physical and emotional injury to Plaintiff. This deliberate indifference directly and proximately caused violation of Plaintiff's Eighth and Fourteenth Amendment rights.

39.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

## COUNT III

## (ASSAULT AND BATTERY)

.        .        .

41.    Defendant[s] assaulted Plaintiff by intentionally and unlawfully kicking and punching him while Plaintiff was restrained on the ground. Defendants further sprayed Plaintiff with a chemical agent without justification.

42.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

## COUNT IV

### (NEGLIGENT FAILURE TO FOLLOW ADOC PROCEDURE)

.          .          .

44.     Defendants owed Plaintiff a duty to follow the ADOC's regulations, including regulation no. 32[7] (Use of Force) and no. 312 (Chemical Agents), as well as training methods and procedures.

45.     Defendants were trained and instructed on the proper use of force and proper use of chemical agents prior to the incident on December 31, 2010.

46.     Defendants breached their duties by violating the ADOC's regulations and by acting contrary to their training methods and procedures.

47.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

## COUNT V

### (NEGLIGENT RETENTION AND SUPERVISION)

.          .          .

49.     At all material times, Ashworth was Dunn's immediate supervisor and English was Ashworth's immediate supervisor.

50.     Ashworth and English owed a duty to Plaintiff to properly supervise Dunn.

51.     Ashworth and English breached these duties by failing to properly train and instruct Dunn on the appropriate methods and procedures when interacting with inmates.

52.     Ashworth and English acted willfully, maliciously, fraudulently, in bad faith, or under a mistaken interpretation of the law in failing to adequately train, supervise, and report Dunn's past violent acts to their superiors.

53.     Although they had knowledge of Dunn's habit for violent and unprovoked attacks on inmates, Ashworth and English willfully and wantonly failed to report or recommend to their superiors that Dunn's employment be terminated.

54.     Furthermore, Ashworth and English's willful and wanton failure to supervise, monitor, and report Dunn for past acts of violence, as well as their failure to recommend that Dunn['s] employment be terminated, constituted a failure to discharge their duties pursuant to standard operating procedure, rules, and regulations, and constituted a breach of the duty owed to the Plaintiff.

55.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change, as well as mental pain and distress.

WHEREFORE, Plaintiff prays [for] judgment against Defendants Ashworth and English for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

## COUNT VI

### (WILLFUL AND WANTON MISCONDUCT)

.     .     .

57.     Plaintiff alleges that Defendants acted with actual malice toward the Plaintiff and with willful or wanton indifference to and with deliberate disregard for human life and the rights of the Plaintiff.

58.     At all times material, Defendants had a duty to refrain from causing injury to the Plaintiff through willful or wanton misconduct.

59.     In breach of their duty to refrain [from] causing injury to the Plaintiff through their willful or wanton misconduct, Defendants are guilty of one or more of the following willful or wanton acts or omissions to act:

(a)     willfully and wantonly using force that exceeded what was justified under the circumstances, although Defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff;

(b)     willfully and wantonly applying excessive force to Plaintiff that was unreasonable and unnecessary, although Defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff;

(c)     willfully and wantonly continuing physical abuse against the Plaintiff while the Plaintiff begged Defendants to quit hitting him during the incident, although Defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff;

(d)     willfully and wantonly failing to prevent Dunn from kicking and punching Plaintiff, although Defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff;

(e)     willfully and wantonly failing to monitor, supervise, and report Dunn's past acts [of] violence towards inmates pursuant to standard procedure, rules and regulations, although defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff; and

(f)     willfully and wantonly failing to report or recommend to their superiors that Dunn's employment be terminated, although they had knowledge of Dunn's past violent acts, and knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff.

60.     As a direct and proximate result of one or more of Defendants' wrongful acts or omissions to act, Plaintiff suffered severe and permanent physical injuries and mental pain  and distress.

WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

(Doc. 111, at ¶¶ 31-33, 35-39, 41-42, 44-47, 49-55 & 57-60.)

## CONCLUSIONS OF LAW

**A.     Summary Judgment Standard**.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant to show

the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen*, supra, at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and show by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'"); *see Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, '"depositions, answers to interrogatories, and admissions on file."'").

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party.").  In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer, supra*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a

repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

In considering whether the defendants are entitled to summary judgment in this case, the Court has viewed the facts in the light most favorable to the plaintiff. *Comer, supra*, 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski, supra*, 573 F.3d at 1165 (internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp., supra,* 43 F.3d at 599.

**B.    The Defense of Qualified Immunity and Plaintiff's Claims of Excessive Force and Failure to Intervene**.  Defendants Ashworth, Pate, Marsh, and English argue that they are entitled to qualified immunity as it relates to plaintiff's claims of excessive force and failure to intervene.[21] It is clear in the Eleventh Circuit, however, that the

---

[21]    In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted); *see also Ashcroft v. al-Kidd,* ___ U.S. ___, ___, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."). In other words, a Court's inquiry into qualified immunity involves two prongs: "First, a plaintiff must show that a constitutional or statutory right has been violated. (Continued)

27

defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*." *Skrtich v. Thornton,* 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted). "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Id*. (citations omitted). As explained by the Eleventh Circuit, "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such [] violation[s]." *Id*.[22] Accordingly, in answering the questions of whether the facts alleged/established by Johnson make out violations of his Eighth Amendment rights, the undersigned looks, in turn, at the force utilized by Dunn and Ashworth.

**Excessive Force—Dunn**. Defendant Dunn has not moved for summary judgment in this case and has thereby conceded that the facts in this case establish (which they do) that in kicking and hitting plaintiff in the left eye on December 31, 2010, while Johnson laid facedown and handcuffed on the ground, he utilized excessive force in violation of the Eighth Amendment. Such concession is consistent with the findings of the ADOC's own internal investigation and is further confirmed by the testimony of moving

---

Second, a plaintiff must show that the right violated was clearly established." *Fennell v. Gilstrap,* 559 F.3d 1212, 1216 (11th Cir. 2009), citing *Danley v. Allen,* 540 F.3d 1298, 1306 (11th Cir. 2008).

[22]     "We created this rule because, for an excessive-force violation of the Eighth . . . Amendment[], 'the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution . . . .'" *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009), quoting *Johnson v. Breeden,* 280 F.3d 1308, 1321-1322 (11th Cir. 2002) (other citation omitted).

defendant Penton Ashworth. Simply put, there can be no doubt that on December 31, 2010, Dunn  applied force to Johnson "'maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers,* 475 U.S. 312, 320-321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (citation omitted).

While defendants Ashworth, Pate, and Marsh have stated (whether by affidavit or deposition testimony, or both)[23] they did not see Dunn kick and hit Johnson and, in any event, could not have done anything to physically stop Dunn's assault,[24] the evidence offered by plaintiff, and considered in the light most favorable to plaintiff, refutes the testimony of the moving defendants. Such evidence establishes that Dunn's assault occurred after plaintiff was handcuffed and laying unresisting on the ground and was an assault which all inmate witnesses could clearly observe though they all were in positions much further away from Dunn than were the moving defendants.[25] Moreover, there is testimony from plaintiff and other inmate witnesses that the moving defendants could have taken some action after Dunn's initial kick but took no action to

---

[23]    While the undersigned does not believe plaintiff alleges that defendant English is in any manner liable for failing to intervene to stop Dunn's assault, to the extent he is making that allegation, English is entitled to summary judgment inasmuch as the evidence clearly establishes that English was not working at Holman Correctional Facility on December 31, 2010.

[24]    *See Campbell v. Harvill,* 2012 WL 928607, *5 (M.D. Ga. Feb. 15, 2012) ("To be held liable for his nonfeasance, an officer (1) must have observed or had reason to know that excessive force would be or was being used, and (2) must have had both the opportunity and the means to prevent harm from occurring."), *report and recommendation adopted by,* 2012 WL 929614 (M.D. Ga. Mar. 19, 2012).

[25]    The undersigned not only finds the moving defendants' testimony that they did not "see" Dunn's attack incredibly convenient but, as well, at least at this point in time, incredible given that all inmate witnesses saw the attack and were much more removed from Dunn than were Ashworth, Marsh, and Pate.  The undersigned will be in a much better position to judge the credibility of all witnesses (including that of defendants Ashworth, Pate, and Marsh) at the evidentiary hearing to be held in this case. *See Gladys, infra,* at *4 ("It is well established that assessing the credibility of the allegations made by a plaintiff or defendant is beyond the scope of a trial court's ruling on a motion for summary judgment.").

physically stop Dunn, nor did any of the aforementioned three defendants order Dunn
to stop the assault. Accordingly, the undersigned finds that Ashworth, Pate, and Marsh
are not entitled to qualified immunity in this regard, as disputed issues of material fact
exist regarding whether these three defendants witnessed Dunn's use of excessive force
and failed to intervene. *Compare, e.g., Connell v. Tate,* 2012 WL 252817, *13 (M.D. Fla. Jan.
25, 2012) ("Since Plaintiff's claim of excessive force survives the Motion for Summary
Judgment, his claim of failure to protect will also survive the Motion for Summary
Judgment[.] . . . Although Defendant Esford claims he is entitled to qualified immunity
because he did not witness the use of force, . . . he originally claimed that he witnessed
the use of force. Plaintiff asserts that Esford witnessed the incident and failed to
intervene when Plaintiff was being beaten by the officers, and Esford was in a position
to intervene. The facts, as alleged, show that Defendant Esford violated a constitutional
right, failing to intervene when Plaintiff was being beaten by correctional officers when
Esford was in a position to intervene.") *with Johnson v. DeLoach*, 692 F.Supp.2d 1316,
1328 (M.D. Ala. Feb. 25, 2010) ("Johnson contends defendant Boozer slapped him in the
face, struck him on the head, threw him to the floor and choked him for no reason and
while he posed no threat to Boozer. . . . Johnson maintains defendants Bradford and
Golson 'just stood [there] and watched' without intervening to stop Boozer. . . . The
defendants further argue neither Bradford nor Golson witnessed any use of excessive
force against Johnson. Viewing the facts in the light most favorable to Johnson, as is
required at this stage of the proceedings, the court concludes defendants Boozer,
Bradford and Golson are not entitled to qualified immunity as the plaintiff has alleged
facts sufficient to survive their motion for summary judgment regarding the excessive
force claim lodged against them. . . . A genuine issue of material fact likewise exists
regarding whether Bradford and Golson witnessed the use of excessive force and failed

to intervene."); *see Campbell, supra,* at *5 ("[I]t is established in the Eleventh Circuit that [an] 'officer has a duty to intervene when another officer uses excessive force.'").

**Excessive Force—Ashworth's Use of Pepper Spray**.  Turning to the excessive force claim asserted against defendant Penton Ashworth, for his use of pepper spray against Johnson, the undersigned notes with interest the following discussion from *Connell v. Tate, supra*:

> [I]n order to prevail on an excessive-force claim, a plaintiff must demonstrate that those who used force against him acted with a malicious purpose. In addition, a plaintiff must prove that a requisite amount of force was used against him. The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.[26] In determining whether the amount of force used against an inmate was *de minimis*, a court may consider the extent of the injuries suffered by the inmate. Nevertheless, a court ultimately should decide an excessive force claim based on the nature of the force rather than the extent of the injury.[27]

*Id.* at *12 (internal quotations marks and citations omitted; footnotes added).[28]

In *Thomas v. Bryant,* 614 F.3d 1288 (2010), the Eleventh Circuit reiterated that while "the use of chemical agents on recalcitrant prisoners is not per se unconstitutional, there are constitutional boundaries to its use." *Id*. at 1310 (all citations omitted). The appellate court further noted that the district court's determination that

---

[26]     It is clear that "the use of *de minimis* force—including chemical sprays—can support an excessive-force claim[.]" *Thomas v. Comstock*, 222 Fed.Appx. 439, 442 (5th Cir. Mar. 16, 2007).

[27]     Beyond the extent of injury inflicted, other relevant factors in evaluating an excessive-force claim include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992), quoting *Whitley v. Albers, supra,* 475 U.S. at 321, 106 S.Ct. at 1085. As touched on hereinafter, this case presents material questions of fact regarding each of these factors such that summary judgment is inappropriate.

[28]     Thus, "[t]he absence of serious injury is [] relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7, 112 S.Ct. at 999.

the DOC's non-spontaneous use-of-force policy was unnecessary and without penological justification in McKinney's particular case was "in keeping" with its prior decisions and the decisions of other circuit courts of appeals, "which have concluded that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment objective harm requirement." *Id*. at 1311, citing *Danley v. Allen,* 540 F.3d 1298, 1311 (11th Cir. 2008) ("holding that prolonged exposure to pepper spray due to a failure to properly decontaminate an inmate may form the basis of an Eighth Amendment claim"); *Iko v. Shreve,* 535 F.3d 225, 239 (4th Cir. 2008) ("use of additional bursts of pepper spray after inmate attempted to comply with officer's orders and which possibly contributed to inmate's asphyxiation and death sufficiently alleged objective component of excessive force claim"); *Soto v. Dickey,* 744 F.2d 1260, 1270 (7th Cir. 1984) ("'[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain.'"); *see Skrtich, supra,* 280 F.3d at 1304 ("The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain."). Given this observation by the Eleventh Circuit, it would no doubt agree with the Eighth Circuit that "[a] basis for an Eighth Amendment claim exists when . . . an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat." *Treats v. Morgan,* 308 F.3d 868, 873 (2002). *Treats,* of course, involved a denial of the defendants' motion for summary judgment on the basis of qualified immunity. *See id.* at 874 & 875 ("In order to overcome the claims of qualified immunity, Treats must also show that his constitutional rights were clearly established. . . . Since Treats has presented sufficient evidence at this threshold stage to show a violation of a clearly

established constitutional right, the district court did not err in denying summary

judgment to appellants.").

> Resolution of the constitutional issue turns on the circumstances of
> the individual case or the particular "prison setting." Not every instance
> of inmate resistance justifies the use of force, and use of pepper spray will
> not be justified every time an inmate questions orders or seeks redress for
> an officer's actions. The test is whether the officer's use of force was
> reasonable under the circumstances, or whether it was punitive, arbitrary,
> or malicious.

*Id*. at 872-873 (internal citations omitted).

In this case, considering the facts in the light most favorable to Johnson, the

undersigned finds that it cannot grant Ashworth summary judgment on the basis of

qualified immunity. ADOC regulations provide that before pepper spray is employed

an inmate must be warned that it is about to be employed (presumably so the inmate

can cover his eyes) and can be utilized only when necessary to gain control of a

situation once lesser methods are unsuccessful—or have been determined ineffective—

or when an inmate utilizes physical resistance to a lawful command. In this case,

plaintiff and defendant Ashworth cannot even agree upon whether Ashworth warned

the inmate that he was about to be sprayed with the Red Sabre, much less whether

Ashworth's order was lawful and—even if lawful—whether Johnson would have

continued to be noncompliant had Ashworth issued a warning before spraying him in

the face. *See Treats, supra,* 308 F.3d at 872-873. Because "the credibility of the allegations

made by a plaintiff or defendant is beyond the scope of a trial court's ruling on a motion

for summary judgment[,]" and Johnson has established/alleged "facts sufficient to

survive a motion for summary judgment concerning his excessive force claim[]"

asserted against Ashworth, Ashworth's "motion to summary judgment on the basis of

qualified immunity is [] due to be denied." *Gladys v. Alabama Department of* Corrections,

2012 WL 3542203, *4 & *5 (N.D. Ala. July 11, 2012) (use of pepper spray), *report and*

*recommendation adopted by,* 2012 WL 3542292 (N.D. Ala. Aug. 13, 2012); *see Skritch, supra,* 280 F.3d at 1301 ("[B]ecause the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*[,] . . . [t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." (internal citation omitted)).

As for plaintiff's claim against defendants Pate and Marsh for failing to intervene, the undersigned declines to grant summary judgment in favor of these defendants since plaintiff's claim of excessive force against Ashworth survives summary judgment, *see Connell, supra,* at *13 ("Since Plaintiff's claim of excessive force survives the Motion for Summary Judgment, his claim of failure to protect will also survive the Motion for Summary Judgment[.]); *Johnson v. Deloach, supra,* 692 F.Supp.2d at 1328 ("[D]isputed issues of material fact exist regarding the need for the use of force by Boozer, the amount of force used by Boozer and whether Boozer acted 'maliciously and sadistically' to cause harm. A genuine issue of material fact likewise exists regarding whether Bradford and Golson witnessed the use of excessive force and failed to intervene."), Ashworth admittedly sprayed Johnson twice, and these defendants were close-at-hand when Johnson was sprayed with the Sabre Red.[29]

**C.     Defendants' Contention that Plaintiff's Case is Barred by the Prison Litigation Reform Act ("PLRA")**.  The moving defendants, citing to § 1997e(e) of the PLRA, contend that Johnson's case is barred by the PLRA because he has failed to allege

---

[29]      Again, while this Court has no indication that plaintiff asserts a claim against defendant English for failing to protect him from Ashworth's pepper spray assault, to the extent he is making that allegation, English is entitled to summary judgment inasmuch as the evidence clearly establishes that English was not working at Holman Correctional Facility on December 31, 2010.

more than a *de minimis* injury. (Doc. 189, at 32-34.) "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Eleventh Circuit has specifically held that "in order to satisfy the statute, 'the physical injury must be more than de minimis, but need not be significant.'" *Dixon v. Toole,* 225 Fed.Appx. 797, 799 (11th Cir. Apr. 4, 2007) (citation omitted).[30]

There is no question, in the undersigned's estimation, that plaintiff's claims for compensatory damages surmount § 1997e(e)'s bar inasmuch as he has put forth a plethora of evidence of physical injury. This evidence consists not only of photographs depicting plaintiff's bruised and swollen left eye (see Doc. 199, Exhibit 35), but, as well, the treatment records from the two hospitals to which Johnson was taken for treatment in the immediate aftermath of the assault (among other treatment afforded,[31] a CT scan of plaintiff's facial bones and C-spine were taken), treatment from Dr. Allen Jones, an ophthalmologist, for acute iritis (inflammation of the eye),[32] along with plaintiff's post-assault development of a cataract and the evidence suggesting that the cataract may be attributable to the trauma he sustained on December 31, 2010. Needless to say, this

---

[30]     "The Eleventh Circuit has interpreted this provision of the PLRA to mean that if due to the defendant's actions, a prisoner has not suffered some physical injury which is sufficient to satisfy the statutory provision in question, and the prisoner therefore cannot show anything more than mental or emotional suffering, the prisoner is foreclosed from obtaining compensatory or punitive damages even if there has been some violation of his constitutional rights." *Thomas v. Pieniozek,* 2011 WL 810696, *3 (S.D. Fla. Feb. 1, 2011), *report and recommendation adopted by,* 2011 WL 777894 (S.D. Fla. Mar. 1, 2011).

[31]     Johnson was treated at North Baldwin Infirmary for chemical burns to his neck and shoulders. (*See* Doc. 199, Exhibit 33.)

[32]     "Iritis is 'inflammation of the iris usually marked by pain,' among other symptoms." *Rice v. Shinseki,* 2011 WL 5301555, *2 n.6 (Vet.App. Nov. 7, 2011) (citations omitted).

evidence belies any suggestion by the defendants that Johnson's eye injury was/is trifling or minimal.[33] *Cf. Luong v. Hatt,* 979 F.Supp. 481, 486 (N.D. Tex. 1997) ("A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional.").

    **D.**    <u>**Plaintiff's State Law Claims**</u>. Defendants Ashworth, Marsh, Pate, and English contend that they are entitled to state-agent immunity on all state-law claims. (Doc. 189, at 34.) Alabama law provides that "[a] State agent *shall* be immune from civil liability in his [] personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising his [] judgment in the administration of a department or agency of government, including, but not limited to, . . . hiring, firing, transferring, or supervising personnel; or [] discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner[.]" *Ex parte Cranman,* 792 So.2d 392, 405 (Ala. 2000) (emphasis in original); *see also Ryan v. Hayes,* 831 So.2d 21, 30 & 31 (Ala. 2002) (same); *Ex parte Butts,* 775 So.2d 173, 177 & 178 (Ala. 2000) (same). Moreover, it is clear under Alabama law that "a State agent *shall not* be immune from civil liability in his [] personal capacity [] when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or [] when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his [] authority, or under a mistaken interpretation of the law." *Ex*

---

[33]    *See* BLACK'S LAW DICTIONARY, at 496 (9th ed. 2009) (defining *de minimis* as trifling, minimal, or "so insignificant that a court may overlook it in deciding an issue or case.").

*parte Cranman,* 792 So.2d at 405 (emphasis in original); *Ryan, supra,* 831 So.2d at 31

(same); *Ex parte Butts,* 775 So.2d at 178 (same). The Alabama Supreme Court has

> established a "burden-shifting" process when a party raises the defense of
> State-agent immunity. In order to claim State-agent immunity, the
> [defendants] bear the burden of demonstrating that [plaintiff]'s claims
> arise from a function that would entitle them to immunity. If the
> [defendants] make such a showing, the burden then shifts to [plaintiff],
> who, in order to deny the [defendants] immunity from suit, must establish
> that the [defendants] acted willfully, maliciously, fraudulently, in bad
> faith, or beyond their authority. A State agent acts beyond authority and is
> therefore not immune when he or she "fail[s] to discharge duties pursuant
> to detailed rules or regulations, such as those stated on a checklist."

*Giambrone v. Douglas,* 874 So.2d 1046, 1052 (Ala. 2003) (internal citations omitted). With

these principles in mind, the undersigned considers each of plaintiff's state-law claims.

**Assault and Battery**.  Alabama law is clear that an assault is "an intentional,

unlawful offer to touch the person of another in a rude or angry manner under such

circumstances as to create in the mind of the party alleging the assault a well-founded

fear of an imminent battery, coupled with the apparent ability to effectuate the attempt,

if not prevented." *O'Rear v. B.H.,* 69 So.3d 106, 117 (Ala. 2011) (internal quotation marks

omitted; citations omitted). "A successful assault becomes a battery, which consists of

the touching of another in a hostile manner." *Id.* (citations omitted).

> In a civil case, the elements of battery are: (1) that the defendant touched
> the plaintiff; (2) that the defendant *intended* to touch the plaintiff; and (3)
> that the touching was conducted in a harmful or offensive manner. Our
> Supreme Court has explained that a battery consists in an injury actually
> *done to the person of another in an angry or revengeful* or rude or insolent
> manner, as by spitting in the face, or in any way touching him in anger, or
> violently jostling him out of the way, or in doing any *intentional violence* to
> the person of another.

*Wood v. Cowart Enterprises, Inc.,* 809 So.2d 835, 837 (Ala. Civ. App. 2001) ((internal

quotation marks, brackets, and citations omitted; emphasis in original). Thus, under

Alabama law, "[t]he plaintiff in an action alleging assault and battery must prove (1)

that the defendant touched the plaintiff; (2) that the defendant intended to touch the

plaintiff; and (3) that the touching was conducted in a harmful or offensive manner."
*Walker v. City of Huntsville,* 62 So.3d 474, 494 (Ala. 2010) (internal quotation marks
omitted; citations omitted).[34]

Because defendant Dunn has not moved for summary judgment, and based
upon the facts developed to date, there is no question but that Dunn's actions in kicking
and punching Johnson in the face constitutes an assault and battery under Alabama
law. Moreover, taking the facts in the light most favorable to plaintiff Johnson, the
undersigned recommends that the Court find that Ashworth's unprovoked actions in
twice spraying plaintiff with Sabre Red without warning also constitutes an assault and
battery under Alabama law.[35] Having made these determinations, the undersigned
turns to a consideration of whether any of the other defendants are liable for the
foregoing assaults and batteries.

Plaintiff nowhere contends in his memorandum brief that defendants Pate and
Marsh are equally responsible for the pepper spray incident (*see* Doc. 199, at 38-39);
instead, he merely contends that when he was taken to the ground and the other
defendants were on top of him such actions constitute discrete independent harmful
touches by each of them and, in addition, these defendants aided and abetted Dunn's

---

[34]     Again, to the extent plaintiff's complaint can be read as stating assault and
battery claims against defendant English, this defendant is entitled to summary judgment on
these claims because he was not on duty at Holman Correctional Facility on December 31, 2010.

[35]     Ashworth's action in spraying the chemical agent in plaintiff's face certainly
constitutes a touching of plaintiff by this defendant and by Ashworth's own admission he
intended to touch Johnson in this manner. Finally, the touching was conducted in a harmful and
offensive manner both because Johnson was not offering physical resistance to a lawful
command and it came without warning in contravention to ADOC regulations. Moreover, in
spraying Johnson with the chemical agent without warning Ashworth engaged in action
beyond his authority or, otherwise, in bad faith.

assault on his person (*see* id. at 39). Accordingly, Marsh and Pate are entitled to summary judgment with respect to the Ashworth assault with pepper spray.

In addition, Ashworth, Pate and Marsh are entitled to summary judgment regarding the Dunn assault and with respect to plaintiff's argument in his brief that their actions in being on top of Johnson and holding him down after he was handcuffed constitutes discrete harmful touchings. With respect to the harmful touching aspect of plaintiff's argument, the undersigned finds it lacking not only because plaintiff did not make any mention of these "touches" in his amended complaint (*see* Doc. 111, at ¶ 41) but, as well, he offers no evidence whatsoever from which this Court can find that such "touches" were conducted in a harmful or offensive manner. As for the aiding and abetting aspect of plaintiff's argument, Alabama law is clear that "'when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally liable with the one who does the act.'" *Deal ex rel. Barber v. Hill*, 619 So.2d 1347, 1349 (Ala. 1993); *compare id. with Thompson v. Johnson*, 180 F.2d 431, 433 & 433-434 (5th Cir. 1950) (case arising out of Mississippi in which the circuit court noted certain well-acknowledged principles of law "covering concerted wrongful action[,]" including the following: "that in addition to persons who actually participate in an assault and battery, persons who aid, abet, or procure the commission thereof, are subject to a civil action therefor; that on the theory that the act of one is the act of all, the rule of joint and several liability of tort feasors prevails where the tort feasors act in

concert or unity of action, and, therefore, applies to tort feasors who intentionally unite in the wrongful act or who are present, assist, or participate therein; and that where two or more persons engage in a common enterprise, they are jointly liable for wrongful acts done in connection with that enterprise, at least where the enterprise is an unlawful one, in which case all are answerable for any injury done by any one of them, although the damage done was greater than was foreseen or the particular act done was not contemplated or intended by them." (internal footnotes omitted)). The initial problem with Johnson's argument in this regard is that nowhere in his complaint does he allege a conspiracy. Moreover, there is simply no evidence that Ashworth, Marsh and Pate entered into a conspiracy with Dunn to assault and batter plaintiff. Indeed, no one present when Dunn initially kicked Johnson on December 31, 2010, including Johnson himself, could have predicted that Dunn would assault plaintiff. Therefore, while there might be a question of fact regarding whether defendants Ashworth, Pate, and Marsh could have intervened to try to prevent Dunn's continued assault of plaintiff's person, there is simply no evidence which supports an inference that these three defendants entered into a conspiracy with Dunn to aid, assist, and abet in Dunn's already-formed intention to assault and batter plaintiff. *Cf. Deal ex rel. Barber, supra,* 619 So.2d at 1349 ("Even assuming the complaint to state a cause of action for conspiracy, and even assuming that Henderson's acts might possibly have violated the *Suits v. Glover* standard, Deal's affidavit does not present sufficient evidence to withstand the summary judgment motion. At most, her evidence shows that Hill failed to override Henderson's already formed intention of punishing Deal. He was not Henderson's supervisor, and there is no evidence that he had authority to instruct her not to punish Deal. Deal states in her affidavit that Hill gave Henderson the pointer after Henderson said she was going to paddle Deal, but this statement is not substantial evidence that

Hill entered into a conspiracy with Henderson to 'inflict on [Deal] immoderate chastisement.'"). Accordingly, defendants Ashworth, Marsh and Pate are entitled to summary judgment to the extent plaintiff now contends these defendants conspired with Dunn to commit assault and battery.

**Negligent Failure to Follow ADOC Regulations**.  It is now clearly established that Alabama allows a plaintiff to maintain a negligence cause of action against individual defendants who claim entitlement to state-agent immunity, provided those defendants acted beyond their authority or failed to discharge duties pursuant to rules and regulations. *Compare, e.g., Ex parte Lawley*, 38 So.3d 41, 44, 47, 48 & 49 (Ala. 2009) ("The complaint alleged claims of negligence and wantonness based upon the petitioners' failure to reinstall lights on the remnants of the pier remaining in the Gulf of Mexico following Hurricane Ivan, as the plaintiffs alleged the petitioners were required to do by certain federal regulations. . . . The plaintiffs contend [] that the petitioners' conduct falls within the exception to State-agent immunity that exists when a 'State agent acts . . . beyond his or her authority.' . . . More specifically, in this case, the plaintiffs rely on the principle articulated previously by this Court that a State agent acts beyond his or her authority when the agent fails '"to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."' . . . The plaintiffs contend that these federal regulations, taken together, implicate the 'beyond-authority' exception to State-agent immunity because the regulations explicitly command that lights must be present on an obstruction in the navigable waters in the United States and that those lights cannot be removed without the approval of the Coast Guard. We agree with the plaintiffs. We reject the argument presented by the petitioners that these regulations do not sufficiently guide the actions of an owner of a structure under the circumstances presented and thus are not sufficiently detailed to serve as a basis for

41

application of the exception recognized in *Cranman* for acts beyond the authority of the State official or employee. . . . Given the materials presented to the trial court and to this Court, we cannot conclude that the trial court erred in refusing, on the ground of . . . State-agent immunity, to dismiss the complaint for failure to state a claim or to enter a judgment on the pleadings; for all that appears, the case before it was one of a simple disregard of a federal mandate." (internal citations omitted)) *with Giambrone, supra,* 874 So.2d at 1050, 1052, 1053, 1055-1056, 1056 & 1057 ("On May 29, 2001, Giambrone, individually, and as mother and next friend of Jake, brought this action. In it she alleged that Douglas was negligent and wanton in wrestling with Jake without having the proper qualifications or training. Giambrone also alleged that Furlow and Long had been negligent and wanton in failing to provide a qualified coach for the wrestling team. Giambrone claimed that the decisions and actions of the faculty members that had resulted in Jake's injury did not involve the exercise of judgment. . . . The trial court entered a summary judgment in the faculty members' favor based on State-agent immunity. . . . Giambrone's action against Douglas arises from the decision Douglas made to engage in a wrestling match with Jake in an attempt to motivate the members of the wrestling team. Such a decision involves the exercise of judgment in educating students, a category included in the *Cranman* restatement of State-agent immunity. Nevertheless, Giambrone argues that Douglas was engaged in a ministerial act and that he was not 'exercising judgment' because, she says, he violated clear rules and regulations governing his position as head coach of the wrestling team. . . . Under our standard in *Cranman*, as applied in *Butts*, State-agent immunity is unavailable to Douglas if he 'failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.' Unlike *Nall*, in this case Furlow, who was in a supervisory position, furnished Douglas with the guidelines and rules of the AHSAA,

the NFW, and the Athletic Directories, and we must consider whether Furlow's furnishing those guidelines and rules imposed a duty upon Douglas to regulate his conduct during the practices of the wrestling team. . . . The guidelines in *Spivey* merely established the general responsibility to apply safety rules to the conduct of students and teachers; here, the guidelines and rules provided specific instructions regarding the proper techniques to be used in coaching the sport of wrestling. The guidelines and rules removed Douglas's judgment in determining whether he should participate in a 'full speed' challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an 'inequitable' challenge match, thereby failing to discharge his duties pursuant to 'detailed rules or regulations,' we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not meet his burden of establishing that his actions and decisions involved functions that entitled him to immunity. . . . Giambrone's action against Furlow and Long arises from Furlow's decision to recommend Douglas to the Board as the head wrestling coach and Long's decision to defer such recommendations regarding athletic personnel to Furlow. Both decisions involved the exercise of judgment in educating students or in supervising personnel, categories within the *Cranman* restatement of State-agent immunity. However, unlike the duties Furlow imposed upon Douglas by his acceptance of the AHSAA guidelines and the NWF rules, no guidelines or rules were imposed upon Furlow and Long specifying how Furlow should choose a coach for the wrestling program and how involved Long should have been in the hiring process for athletic personnel. Because the Board had not adopted any guidelines or rules addressing those issues, Furlow and Long 'were left to exercise

broad judgment' in making their respective decisions regarding the appropriate level at which to supervise personnel, the qualifications required in a wrestling coach, and the safety measures that were to be provided at each wrestling practice. . . .  These general statements [from the Athletic Directories and the AHSAA] are not the type of detailed rules and regulations that could remove the exercise of Furlow and Long's judgment in the performance of required acts. Furlow and Long met their burden of establishing that their actions and decisions involved functions entitling them to immunity. In order to deny Furlow and Long immunity from suit, therefore, Giambrone must establish that they acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. Giambrone initially claimed that Furlow and Long acted beyond their authority by violating the guidelines or rules promulgated by the AHSAA, the NFW, and the Athletic Directories. However, because the guidelines and rules do not impose mandatory duties upon Furlow and Long, the decision whether to follow the guidelines and rules was within their judgment. . . . With the benefit of hindsight, one might conclude that judgment could have been better exercised and the incident avoided if Furlow had recommended a coach with more wrestling experience or if Long had been more involved in Douglas's hiring. However, under our standard in *Cranman*,[] we do not hold State agents answerable in money damages for the consequences of poor judgment in the education of students. The immunity afforded State agents who exercise their judgment in the education of students and the supervision of personnel is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. The facts here do not fit within this exception to State-agent immunity." (internal citations omitted)). Indeed, in the context of an action brought, in part, against two prison wardens and alleging negligence against them, as

well as that these two defendants "'acted willfully and beyond their authority' and acted in violation of agency policy[,]" the United States District Court for the Middle District of Alabama specifically recognized that "the possibility that Mr. Daniels or Mr. Jones acted outside of his authority or failed to discharge duties pursuant to rules and regulations is not foreclosed by an assertion of negligence." *Wynn v. Lewis Trucking Co.,* 2009 WL 499457, *2 & *3 (M.D. Ala. Feb. 27, 2009).

In light of these principles, and in consideration of the contents of the ADOC's use of force regulation (No. 327) and use of chemical agents regulation (No. 312) and the facts in dispute in this case, the undersigned finds that the Court should decline to grant Ashworth summary judgment on the basis of state-agent immunity with respect to the pepper spray incident. This is because the foregoing regulations can be read as establishing not only a duty to use the least amount of force necessary under a restricted set of circumstances—that is, in self-defense to physical assault, for protection of others, or when an inmate exercises physical resistance to a lawful command—but also a duty to use pepper spray only to gain or regain control of a situation when other lesser methods have proven to be unsuccessful and only after giving a verbal warning of its impending use and the facts in this case, taken in the light most favorable to plaintiff, certainly suggest that Ashworth failed to discharge his duties under those regulations (or otherwise acted beyond his authority) by spraying Johnson without warning in the context of a situation that did not warrant such use of force.[36]

However, Pate and Marsh are entitled to summary judgment on this claim both with respect to the pepper spray incident and with respect to the Dunn assault, as is

---

[36]     Indeed, plaintiff has even questioned whether Ashworth's instruction to Johnson to go to the "Q-Unit" was a lawful order since the defendants have not offered anything beyond hearsay evidence that Ashworth was instructed by medical staff to place Johnson in the Q-Unit.

Ashworth with respect to Dunn's assault. In this regard, plaintiff contends only that "[n]obody did anything to stop the abuse, even though regulation no. 327 demands that force stop if the inmate is not resisting." (Doc. 199, at 38.) While it is true regulation 327 states that force "will stop" when resistance by the inmate ceases, this mandate is directed to the individual applying the force. Nothing in the regulations which plaintiff cites to concomitantly provides that the officers who are not applying any force have an affirmative (or a mandatory) duty to stop another officer's use of force, either by words or actions. Thus, there is nothing to suggest that Marsh and Pate failed to discharge any mandatory duties under the above-cited regulations with respect to their superior (Sergeant Ashworth) and fellow correctional officer (Dunn) spraying Johnson with pepper spray or that Ashworth, Marsh or Pate failed to discharge any mandatory duties under those regulations with regard to the Dunn incident. In addition, the evidence simply does not establish any evidence that the defendants acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority in this regard. *Cf. Wynn, supra,* at *3 ("[N]egligence falls below the standard of malicious, willful, or fraudulent behavior[.]"). Accordingly, the moving defendants (save Ashworth with respect to the pepper spray incident) are entitled to summary judgment with respect to plaintiff's claim of negligent failure to follow ADOC regulations[37].[38]

---

[37]    For these same reasons, the undersigned recommends that the Court enter summary judgment in favor of defendants Ashworth, Pate and Marsh on plaintiff's claim that these defendants "willfully and wantonly fail[ed] to prevent Dunn from kicking and punching Plaintiff, although Defendants knew, or should have known, that such conduct posed an unreasonable risk of causing serious injury to Plaintiff[]" (Doc. 111, ¶ 59(d)).  *Cf. Giambrone, supra,* 874 So.2d at 1057 ("The immunity afforded State agents who exercise their judgment in the education of students and the supervision of personnel is not abrogated for negligent and *wanton* behavior[.]").

[38]    Again, to the extent plaintiff asserts this claim (and any wantonness claim arising out of the events on December 31, 2010—*see* Doc. 111, ¶ 59(a)-(d)) against English, English is (Continued)

**Negligent Retention and Supervision**.  Plaintiff's negligent retention and supervision claim is asserted solely against defendants Penton Ashworth and James English. (*See* Doc. 111, ¶¶ 49-55.) In his brief, plaintiff appears to concede that his claim is solely a failure to supervise claim. (*See* Doc. 199, at 18-21.)[39] And while plaintiff's amended complaint gives every indication that this claim is a state-law claim (*see* Doc. 111, ¶¶ 49-55), his brief in response to the motion for summary judgment seems to suggest that this is a § 1983 claim or some type of hybrid claim (*see* Doc. 199, at 18). Regardless of whether the claim is brought solely pursuant to § 1983, or under state law, the undersigned is of the opinion that it fails.

As Johnson correctly points out in his brief (Doc. 199, at 18), "'supervisors can be held liable for subordinates' constitutional violations on the basis of supervisory liability under 42 U.S.C. § 1983.'" *Williams v. Santana*, 340 Fed.Appx. 614, 617 (11th Cir. Aug. 11, 2009) (citations and brackets omitted).

> Supervisory liability under § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation.[40] . . .
>
> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a

---

entitled to summary judgment because he was no on duty a Holman Correctional Facility on December 31, 2013.

[39]     To the extent the undersigned has misread plaintiff's brief, any state-law claims of negligent and/or wanton retention asserted against Ashworth and English cannot survive the defendants' motion for summary judgment for the same reason that his negligent and wanton failure to supervise claims fail.

[40]     In other words, the supervisor's conduct must be "causally related to the constitutional violation committed by his subordinate[.]" *Greason v. Kemp,* 891 F.2d 829, 836 (11th Cir. 1990).

> supervisor's custom or policy results in deliberate indifference to
> constitutional rights; or 3) facts support an inference that the supervisor
> directed subordinates to act unlawfully or knew that subordinates would
> act unlawfully and failed to stop them from doing so.

*Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (some internal quotation marks

omitted; citations omitted; footnote added), *cert. denied,* 552 U.S. 1095, 128 S.Ct. 865, 169

L.Ed.2d 723 (2008); *see also A.P. ex rel. Bazerman v. Feaver,* 293 Fed.Appx. 635, 651 n. 60

(11th Cir. Aug. 21, 2008) (same); *cf. Roy v. Johnson,* 97 F.Supp.2d 1102, 1112 (S.D. Ala.

2000) ("In order to state a § 1983 claim against a supervisor for failure to supervise, a

plaintiff 'must present some evidence that the [defendant] knew of a need to train

and/or supervise in a particular area and the defendant made a deliberate choice not to

take any action[,]" that this failure to train and/or supervise constitutes a custom or

policy, and that the failure to train and/or supervise was the moving force behind the

deprivation of a constitutional right."). As reiterated by the Eleventh Circuit in *Williams,*

*supra,* "'[t]he deprivations that constitute widespread abuse sufficient to notify the

supervising official must be obvious, flagrant, rampant and of continued duration,

rather than isolated occurrences.'" 340 Fed.Appx. at 617, quoting *Brown v. Crawford,* 906

F.2d 667, 671 (11th Cir. 1990). This Court obviously need look individually at Ashworth

and English to determine whether the evidence is sufficient to hold each liable in his

individual capacity. *See A.P. ex rel. Bazerman, supra,* 293 Fed.Appx. at 651 & n.60.

As for the negligent supervision claim actually set forth in plaintiff's amended

complaint, clearly a state-law claim, "Alabama recognized a cause of action for

negligent training or supervision in *Big B, Inc. v. Cottingham,* 634 So.2d 999, 1002-03 (Ala.

1993)." *Norman v. Southern Guaranty Ins. Co.,* 191 F.Supp.2d 1321, 1337 (M.D. Ala. 2002).

> According to that court, "liability depends upon its being established by
> affirmative proof that such incompetency was actually known by the
> master or that, had he exercised due and proper diligence, he would have
> learned that which would charge him in law with such knowledge.

> Evidence of this actual or constructive knowledge may consist of specific acts of incompetency brought to the master's attention or a pattern of incompetent acts such that the character, frequency, and seriousness of the acts must have brought the incompetency to the master's attention in the exercise of due care. A plaintiff must also show that the above breach of the employer's duty to reasonably supervise his or her employees proximately caused the plaintiff's injury.

*Id.* (internal citations omitted). Thus, "[a] claim for negligent supervision is, at bottom, a negligence claim[,]" such that a plaintiff "must establish the elements of duty, breach, causation, and injury." *Camp v. Correctional Medical Services, Inc.,* 668 F.Supp.2d 1338, 1365 (M.D. Ala. 2009), *aff'd in part as clarified,* 400 Fed.Appx. 519 (11th Cir. 2010), *cert. denied sub nom. Naglich v. Camp,* ___ U.S. ___, 131 S.Ct. 2991, 180 L.Ed.2d 821 (2011). And, as these cases and Alabama cases make clear, negligent supervision (and for that matter retention) claims must necessarily be brought against the recalcitrant employee's employer, not against the employee's supervisors. *Compare Norman, supra,* at 1337  ("A plaintiff must also show that the above breach of the ***employer's*** duty to reasonably supervise his or her employees proximately caused the plaintiff's injury." (emphasis supplied)) *with Camp, supra,* at 1365 ("To satisfy the breach element of a claim for negligent supervision, a plaintiff must present evidence that (1) the employee acted incompetently and (2) the ***employer*** had notice of the incompetency but failed to act." (emphasis supplied)); *Ex parte Transportation Leasing Corp.,* 2013 WL 1858774, *4 (Ala. May 3, 2013) ("'It has been stated generally that, in order for an ***employer*** to be liable for the negligent hiring, training, retention, and supervision of its employee, the plaintiff must also prove "wrongful conduct" on the part of the employee." (emphasis supplied)); and *Beddingfield v. Linam,* 2013 WL 857288, *9 (Ala. Mar. 8, 2013) ("This Court's research ***has not found any Alabama case that sets out the elements of a claim of negligent supervision that does not involve an employer/employee relationship***, nor has our research found any case that describes a claim of wanton supervision. We

decline to extend our holdings in negligent-supervision cases to recognize a cause of action based on a parent's negligence or wantonness in supervising his or her own child." (emphasis supplied)). In other words, "Alabama law is clear that the tort of negligent supervision or training requires as an element the existence of a master-servant relationship[]" and since "the status of 'master' is restricted to one who is actually or essentially the employer of the servant[,]" a "supervisor is not the master of a subordinate, nor is the subordinate the servant of the supervisor[.]" *Ott v. City of Mobile,* 169 F.Supp.2d 1301, 1315 (S.D. Ala. 2001). Thus, "Alabama recognizes no cause of action against a supervisor for negligent failure to supervise or train a subordinate[.]" *Id.; see also Driskill v. Great Southern Life Ins. Co.,* 2003 WL 23318664, *2, *3 & *4 (N.D. Tex. Aug. 22, 2003) ("Driskill also alleges that Parsons is liable for negligent and wanton supervision of Gaines. Driskill acknowledges that *Ott v. City of Mobile* . . . addresses the question whether a mere supervisor—as opposed to a master—can be liable for negligent supervision. . . . The court [] concludes that Alabama law requires that the person sued essentially be the employer of the servant in order to be held liable for negligent supervision.  . . . There is no arguably reasonable basis for predicting that Driskill could prevail against Parsons when no court has imposed liability for negligent supervision on a supervisor and, to do so, it would be necessary to ignore clear language limiting negligent supervision claims to 'masters'—a group of persons that does not include supervisors."). The holding by this Court in *Ott* was recently reaffirmed by the United States District Court for the Northern District of Alabama in *Agee v. Mercedes-Benz U.S. International, Inc.,* 2013 WL 832354 (Feb. 28, 2013), plaintiff alleging in her complaint a claim for negligent and/or wanton failure to terminate, monitor and/or train against co-employees Carol Davis and Jeff Burbank and the court dismissing such claim on the basis that the complaint contained no allegation that Davis

and Burbank were plaintiff's employer and the finding by the court that Davis and Burbank were not plaintiff's employer. *See id*. at *6.

In light of the foregoing, it is understandable that Johnson would try to morph his claim into one under § 1983 given that Ashworth and English were not Dunn's employer, only arguably his supervisors, and Alabama simply does not recognize a cause of action against a supervisor for negligent failure to supervise a subordinate employee. *Compare Agee, supra, with Ott, supra*. Thus, plaintiff's state-law claims of negligent and wanton supervision[41] cannot survive the motion for summary judgment filed by Ashworth and English. *Compare Agee, supra,* at *6 (dismissing claim that asserted both negligent and wanton failure to terminate, monitor and/or train against plaintiff's co-employees) *with Driskill, supra,* at *4 ("[T]he court holds that there is no reasonable possibility that Driskill has stated a valid claim for negligent or wanton supervision against Parsons [under Alabama law].") and *Buckentin v. SunTrust Mort. Corp.,* 2013 WL 830887, *12 (N.D. Ala. Mar. 4, 2013) ("To establish a wantonness claim requires more than a mere showing of a higher degree of culpability than negligence. Wantonness is characterized as a conscious act and requires a different and more stringent set of proof. Plaintiffs' failure to establish even their negligent retention claim necessarily precludes their assertion of any wantonness claim related to the same subject matter.").

Therefore, the undersigned focuses on what now appears to be Johnson's claim against Ashworth and English, that is, a failure to supervise claim under § 1983. (*See* Doc. 199, at 18-21.) Indeed, Johnson argues in his brief that taking the evidence in the

---

[41]    The wanton supervision/retention claims asserted against Ashworth and English are contained in ¶ 59(e) & (f) of the amended complaint. (*See* Doc. 111.)

light most favorable to him, he has "provided substantial evidence of the 'causal connection' set forth in <u>Williams</u>." (*Id.* at 21.) "Quite simply, Ashworth and English failed to report an excessive force case to Patterson and I & I which allowed Dunn to remain employed at Holman." (*Id.*) Plaintiff argues in his brief that if Warden Patterson had been notified by Ashworth and English that Dunn hit inmate Broadhead in his head during a cell extraction on November 10, 2010, the warden would have been compelled to fire Dunn given that Dunn twice had been disciplined for fighting with co-employees while employed by the ADOC at Fountain from August 2006 to July 2007 and Administrative Regulation 208 provides that correctional officers should be fired if they engage in "fighting, assault, physical violence or disruptive behavior" on three separate occasions.  (*See id.* at 18-20.) Based on the foregoing allegations, it is apparent that plaintiff is attempting to establish causal connection through a history of widespread abuse by Dunn which put Ashworth and English "on notice of the need to correct the alleged deprivation," and the failure of these defendants to do so. (*See id.* at 18-21.)

As the court made clear in *Williams, supra*, "'[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" 340 Fed.Appx. at 617, quoting *Brown, supra*, 906 F.2d at 671. With respect to English, and to the extent it even matters, there is absolutely no evidence that he knew about any of Dunn's issues with co-employees when Dunn worked for the ADOC at Fountain Correctional Facility.[42] Moreover, although English did have notice of the incident with Broadhead, it

---

[42]      In addition, nothing from the deposition testimony taken in this case gives any indication that English had any inkling that inmates viewed Dunn as a racist (and treated black (Continued)

was Ashworth's testimony that English specifically instructed Dunn not to hit inmates in the head. So, not only did English attempt to correct any arguable deprivation (that is, any arguable excessive use of force) but, as well, the Broadhead incident, of which English knew, cannot be viewed by this Court as anything more than an isolated occurrence which would not have put English on notice that he should do more than he did.[43] Because there is no causal connection with respect to English, this defendant is entitled to summary judgment.

For these same reasons, Ashworth is also entitled to summary judgment. This defendant's awareness of one of the altercations Dunn had with a co-employee at

---

prisoners in a manner different than the treatment accorded white inmates) or that Dunn "liked to fight."

[43]    While the undersigned does not disagree with plaintiff that English (and Ashworth) should have set forth in the Broadhead incident report that Dunn hit Broadhead in the head with his closed fist, the undersigned cannot agree that such report would have resulted in Dunn's dismissal. In this regard, plaintiff cites to a stale (and inapplicable) penalty provision contained in Administrative Regulation 208—that is ¶ 25 for fighting, assault, physical violence or disruptive behavior set forth in the 2005 version of Annex H attached to Administrative Regulation 208 (*see* Doc. 199, Exhibit 27, Annex H, at 1)—and argues that the altercations Dunn had with co-employees at Fountain Correctional Facility during Dunn's first period of employment should "count" such that Dunn would have been dismissed had English (and Ashworth) reported Dunn's conduct during the Broadhead cell extraction (*see id.* (providing a first offense of infraction # 25 results in a 5-day suspension, a second offense results in a 15-day suspension, and a third offense results in dismissal)). The penalty provision plaintiff relies upon is not only stale, but, as well, plaintiff's argument in this regard rests upon the unsupportable proposition that Dunn's conduct while he was initially employed by the ADOC at a different prison facility would "follow" him upon reemployment with the ADOC. Not only does plaintiff not provide this Court with appropriate legal support in this regard but, indeed, if such conduct had followed Dunn, he would have been dismissed immediately upon issuance of the revamped Annex H to Administrative Regulation 208 in 2009, given that the reworked Annex H provides for a three-day suspension upon a first offense for fighting, assault, physical violence or disruptive behavior and dismissal upon a second offense. (*See* Doc. 190, Exhibit 14, Annex H, #29, at 3.) Because plaintiff has offered this Court no logical explanation for such "apple" conduct (i.e., fighting with co-employees) following Dunn when he started hitting inmates ("oranges") in the head during the latter part of 2010, it is clear to the undersigned that even had English (or Ashworth) reported Dunn's action of hitting Broadhead in the head in the incident report the most that would have happened is that Dunn would have been given a three-day suspension for a first violation of infraction #30 contained in the 2009 version of Annex H.  (*See* Doc. 190, Exhibit 14, Annex H, #30, at 4.)

Fountain and Dunn's penchant for fighting simply does not equate to Ashworth's knowledge that Dunn had a history of widespread abuse. Indeed, this evidence does not constitute a history of widespread abuse of prisoners or a widespread history of numerous prior incidents involving Dunn's use of force against inmates, which is what is required here. *Compare Williams, supra,* 340 Fed.Appx. at 618 ("[T]he **numerous** prior incidents involving Barazal's use of force were sufficient to put Parker on notice of misconduct that was sufficiently 'obvious, flagrant, rampant and of continued duration' to require him to act. . . . Even though it is not clear how the other complaints against Barazal were resolved, the fact that eight claims of violence or deprivation of constitutional rights were lodged against Barazal between July 1998 and August 2002 indicates that Parker was on notice of a potential problem." (emphasis supplied)) *with Danley v. Allen,* 540 F.3d 1298, 1315 (11th Cir. 2008) ("This Court has long recognized that supervisors are liable for the excessive force . . . of their employees where the supervisor received **numerous** reports of prior misconduct ***of that nature*** by those same employees and did nothing to remedy the situation." (emphasis supplied)), *overruling on other grounds recognized by Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010). Stated differently, the Broadhead incident was isolated and, therefore, was not sufficient to put Ashworth on notice of misconduct sufficiently "obvious, flagrant, rampant and of continued duration" to require him to act. Accordingly, Ashworth is also entitled to summary judgment in his favor on Johnson's failure to supervise claim.

## CONCLUSION

Based upon the foregoing, the moving defendants' motion for summary judgment is due to be **GRANTED IN PART** and **DENIED IN PART**. Defendant James English's motion for summary judgment is **GRANTED IN ITS ENTIRETY** such that all claims asserted by Johnson against English should be **DISMISSED WITH PREJUDICE**.

The motion for summary judgment filed on behalf of defendants Penton Ashworth, James Pate, and Roger Marsh should be **GRANTED IN PART** and **DENIED IN PART**, as more fully explained in the body of this report and recommendation.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 10th day of June, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**