**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

DAVID L. JOHNSON, AIS 134016,           :

     Plaintiff,           :

vs.           :           CA 11-0228-CG-C

PENTON ASHWORTH, et al.,           :

     Defendants.

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), following an evidentiary hearing conducted on August 13, 2014 directed primarily to plaintiffs' damages to which the defaulting defendants (Donald Bell and Christopher Mummert) are allegedly liable in light of the defaults entered against Bell and Mummert (*see* Docs. 110 & 197). Because the default against Bell (Doc. 110) was entered prior to the filing by plaintiff of the amended complaint, in which a failure to intervene claim was separately and specifically asserted against Bell and Mummert (Doc. 111; *compare id. with* Doc. 1), the undersigned entered an order on August 15, 2014, extending to plaintiff the opportunity to file a motion for default judgment as to defendant Bell on the basis of the amended complaint (Doc. 240, at 2). That motion for default judgment having been filed (Doc. 179), the undersigned is now in a position to decide whether default judgment should be entered in favor of Johnson against Bell and Mummert and, if so, the damages, if any, due and owing plaintiff from the defaulting defendants.

In the previously-referenced order entered by the undersigned on August 15, 2014 (Doc. 240), the Magistrate Judge informed plaintiff that any request for an award

of attorneys' fees and costs against the defaulting defendants would be "part and parcel[]" of the instant report and recommendation (*id.* at 2) and, therefore, instructed plaintiff to file a motion for an award of costs and attorneys' fees by a date certain (*id.* at 3). Plaintiff's initial motion for an award of attorneys' fees and brief in support thereof (Doc. 244) was filed on September 10, 2014, and a supplemental motion was filed on November 4, 2014 (Doc. 246).

## FINDINGS OF FACT

Plaintiff filed his § 1983 complaint in this Court, without the assistance of counsel, on May 6, 2011. (Doc. 1.) Therein, plaintiff specifically asserted claims of excessive use of force against the named defendants, including Cadets Bell and Mummert. (*See id.* at 4.) In his attached affidavit, plaintiff outlined all facts giving rise to his asserted excessive use of force claims, including the following:

> I told Sgt. Ashworth that I want[ed] to sign a refusal medical form and that I did not want to go to the medical holding cell. Sgt. Ashworth told me I cannot sign a refusal slip and that I will have to go to the medical holding cell anyway. I stated to Sgt. Ashworth that he might as well lock me all the way up into segregation and whatever he is going to do to me he might as well do it to me right here on the hall. Sgt. Ashworth had already took his pepper spray out behind his back and up it and started to spray me in the face and body area . . . . I started to back up against the wall and behind me was a wooden stool I pick up and holded it in front of my face to shield my face from the pepper spray. [When] Sgt. Ashworth and C.O.I DUNN stop[ped] spraying me and I put the stool down on all four legs [], that[']s when Sgt. Ashworth ran and knocked me to the floor. Sgt. Ashworth, C.O.I DUNN, C.O.I Pate[], Cad[e]t Bell and Cad[e]t Mummert was on top of me face down on the floor with my hands behind my back handcuffed. C.O.I DUNN got up off me and started to kick me in the face twice and put his knee on my neck and started to hit me in the face with his fist. When he stop[p]ed my left eye was swollen shut and I was in pain. Sgt. Ashworth and C.O.I Pate[] picked me up off the floor and took me into the Shift Office. Sgt. Ashworth, C.O.I Pate[], Cad[e]t Bell, Cad[e]t Mummert held[] me down on the floor while C.O.I DUNN kick and beat me in the face. C.O.I Marsh[] st[oo]d[] by the gates and just looked. After about ten minutes in the Shift Office[,] I was escorted to the holding cell with my eye still swollen and in pain from my eye and the excessive pepper spray burning me on my face and body. Officer Marsh[]

2

and none of the other officers did not stop C.O.I DUNN from kicking, beating or any of his action of the assault.

(*Id*. at 6.)   The Clerk of Court initially made an entry of default with respect to Cadet Bell on February 29, 2012. (Doc. 50.) One month later, on March 29, 2012, William G. Chason, Esquire, was appointed to represent Johnson (Doc. 67) and one of the first actions taken by appointed counsel was the filing, on June 13, 2012, of a motion for default judgment against Donald Bell (Doc. 99; *see also* Doc. 100 (affidavit)).[1] On June 19, 2012, the undersigned recommended the granting of Johnson's motion for default judgment against defendant Bell (Doc. 104) and on July 12, 2012, the Court entered default judgment in favor of Johnson and against Donald Bell "in an amount to be determined following the evidentiary hearing[.]" (Doc. 110.)[2]

On July 20, 2012, Johnson, through appointed counsel, filed an amended complaint in which he specifically asserted six claims, including excessive use of force claims against defendants Dunn and Ashworth and failure to intervene claims against defendants Ashworth, Bell, Marsh, Mummert and Pate. (*See* Doc. 111, at 6-7.)

17.   Upon hearing that he was being moved to the holding cell, Plaintiff requested to sign a medical refusal form so that he could remain in his

---

[1]   Appointed counsel also filed an application for entry of default against Donald Bell. (Doc. 101.) This application, however, was unnecessary in light of this Court's February 28, 2012 Order (Doc. 49) which instructed the Clerk of Court to proceed with entry of default as to defendant Bell. (*See* Doc. 104, at 1  n.1 ("Plaintiff's concurrent application to the Clerk of Court for entry of default against Donald Bell [] is **MOOT** inasmuch as the Clerk entered default against Donald Bell, for failure to plead or otherwise defend, on February 29, 2012 [].").)

[2]   At this time, neither the undersigned nor the Court made any determination regarding whether the factual allegations in the complaint "matched up" with the elements of a failure to protect claim (*compare* Doc. 104 *with* Doc. 110) and, in truth, in filing the motion for default judgment plaintiff merely referenced the excessive force claim, not a failure to intervene claim (*see* Docs. 99, at ¶ 4 ("The Complaint contains a cause of action for damages resulting from the use of excessive force in violation of Johnson's civil rights.")). As set forth *infra*, because neither the undersigned nor the Court attempted to "match" plaintiff's factual allegations with the elements of a failure to intervene claim, all that was entered by the Court on July 12, 2012  was a "default," not a "default judgment."

normal cell block. Plaintiff did not want to ingest medication for allegedly having high blood sugar. Ashworth responded that Plaintiff did not have the right to sign a medical refusal form. Ashworth and Dunn then became aggressive and suggested that Defendants would physically move Plaintiff to the holding cell.

18.     Without warning, provocation, or any physical threats made by Plaintiff, Ashworth sprayed Plaintiff in the face with a chemical agent called Sabre Red. After being initially sprayed with Sabre Red, Plaintiff backed up against a wall in the hallway and found a small wooden stool. Plaintiff picked up the stool to shield his face from the Sabre Red. Plaintiff did not threaten or attempt to hit Defendants with the wooden stool. Ashworth then sprayed Plaintiff a second time with Sabre Red, causing Plaintiff to drop the wooden stool.

.     .     .

20.     After being sprayed twice with Sabre Red, Plaintiff was incapacitated and helpless. Defendants then tackled Plaintiff, pinned him on the ground, so that his chest was facing the ground and his hands were behind his back. Plaintiff did not resist Defendants while pinned on the ground. While on the ground, Defendants handcuffed Plaintiff.

21.     While Defendants had Plaintiff immobile and controlled on the ground, Dunn kicked and punched Plaintiff in the face causing severe injuries. Plaintiff begged Defendants to quit hitting him during the incident but the physical abuse continued. Defendants had the opportunity to prevent Dunn from kicking and punching Plaintiff but failed to do so.

.     .     .

25.     Defendants intentionally attempted to conceal what occurred during the assault by fabricating a story that Plaintiff's injuries arose from a brachial stun technique and/or from Plaintiff hitting his face on the ground when he was tackled. Defendants collaborated to suppress the actual events and falsified statements and other documents.

.     .     .

27.     Because of the assault and attempted cover-up, Dunn, Bell, and Mummert were forced to resign and/or were fired by the ADOC.

28.     Dunn has a lengthy history of violent behavior, having been in numerous fights prior to December 31, 2010, including:

        a.     Prior to working at Holman Correctional Facility, Dunn worked at Fountain Correctional Facility and was involved in a fight with

an African-American correctional officer. The fight was caused as a result of Dunn using racial slurs;

      b.    Before December 31, 2010, while Dunn was working at Holman Correctional Facility, Dunn was involved in a "cell extraction" and hit an African-American inmate in the head with his fist while the inmate was on the ground. Sergeant Penton Ashworth witnessed the incident. Lieutenant Michael English warned Dunn to not strike inmates in the head.

      c.    Dunn was further involved in a physical altercation while working for the City of Atmore's police department which caused the City of Atmore to force Dunn to resign.

29.    Prior to and while working at Holman Correctional Facility, Dunn had a reputation for violent behavior, particular[ly] towards African-American inmates, and Defendants knew or should have known of Dunn's propensity to physically harm inmates.

## COUNT I

## (EXCESSIVE FORCE)

.     .     .

31.    Defendants, acting under the color of state law, violated Plaintiff's rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments by using force maliciously and sadistically to cause harm. Defendant Ashworth sprayed Plaintiff twice with Sabre Red without warning, provocation, or reason. Defendant Dunn kicked and punched Plaintiff in the head, while Plaintiff was handcuffed on the ground.

32.    As  a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

33.    Defendants knowingly, willfully, and recklessly disregarded Plaintiff's constitutional rights.

      WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

## COUNT II

## (FAILURE TO INTERVENE AND DELIBERATE INDIFFERENCE)

.        .        .

35.     Defendants Ashworth, Bell, Marsh, Mummert and Pate were present for and witnessed the excessive force applied to Plaintiff, yet they failed to take steps to protect Plaintiff. Defendants Ashworth, Bell, Marsh, Mummert and Pate did nothing to discourage the excessive force, even though they had a realistic opportunity to do so.

36.     Defendants failed to report the incident in violation of ADOC's regulations.

37.     Defendants had a duty to intervene when Ashworth and Dunn began using excessive force. Defendants consciously chose not to intervene or take any reasonable steps to protect Plaintiff and, as such, they are liable for nonfeasance.

38.     By allowing Dunn, who had a known proclivity toward violence, to kick and punch Plaintiff while he was restrained and on the ground, Defendants Ashworth, Bell, Marsh, Mummert and Pate were deliberately indifferent to the resulting substantial risk of physical and emotional injury to Plaintiff. This deliberate indifference directly and proximately caused violation of Plaintiff's Eighth and Fourteenth Amendment rights.

39.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered injury, pain, and emotional distress in that his face was bruised and swollen, his skin was treated for excessive exposure to Sabre Red, and his left eye suffered subconjunctival hemorrhaging, acute iritis, decreased vision and nuclear sclerotic cataract change.

        WHEREFORE, Plaintiff prays [for] judgment against Defendants for compensatory and punitive damages in an amount to be determined by the Court, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, costs, and for other and further relief as the Court deems proper.

(*Id*. at ¶¶ 17-18, 20-21, 25, 27-29, 31-33 & 35-39; *see also* Doc. 155, at ¶¶ 18-19, 21-22, 26, 28-30, 32-34 & 36-40 (identical allegations).)[3]

---

[3]     Plaintiff's second amended complaint, filed October 1, 2012, did not substantively alter any of the causes of action asserted against, in particular, defendants Dunn, Ashworth, Bell and Mummert. (*See* Doc. 155; *compare id*. at 3-7 *with* Doc. 111, at 3-7 (identical allegations).) Indeed, the order entered on October 4, 2012 allowing the amendment recognized (Continued)

6

Plaintiff made application to the Clerk for entry of default against defendant Christopher Mummert on December 10, 2012 (Doc. 180) and the Clerk entered default against Mummert on December 12, 2012 (Doc. 181). Concurrent with the filing of the application to the Clerk for entry of default, Johnson also filed a motion for default judgment as to Mummert (Doc. 179). At this time, of course, the operative pleading was plaintiff's second amended complaint (Doc. 155), which, as aforesaid, asserted identical claims against Bell and Mummert, as well as Dunn and Ashworth, as contained in the first amended complaint (Doc. 111).[4] On December 18, 2012, the undersigned recommended the granting of Johnson's motion for default judgment against defendant Mummert (Doc. 185) and by order (not a judgment) dated January 30, 2013, the Court granted plaintiff's motion for entry of default judgment as to Christopher Mummert and noted that "[t]he amount of damages defendant Mummert owes to the plaintiff will be determined following an evidentiary hearing and incorporated in the final report and recommendation." (Doc. 197.)[5]

_____

that the pleading made "those formulaic changes authorized by the undersigned in the report and recommendation entered on September 14, 2012" (Doc. 158, at 1), that is, changing defendant English's first name to James and specifically asserting that plaintiff's claims were being brought against the defendants solely in their individual capacities (*see id.*).

[4] Because the second amended complaint was substantively identical to the first amended complaint, plaintiff averred in his motion for default judgment that though Mummert was served with the first amended complaint, he failed to file an answer or special report. (*See* Doc. 179, at ¶¶ 3-6.)

[5] Again, as with the initial complaint and the default against Bell, neither the undersigned nor the Court made any determination regarding whether the factual allegations in the complaint "matched up" with the elements of a failure to intervene claim (*compare* Doc. 185 *with* Doc. 197) and, in truth, in filing the motion for default judgment plaintiff, again, merely referenced the excessive force claim, not a failure to intervene claim (*see* Doc. 179, ¶ 7 ("The Complaint contains a cause of action for damages resulting from the use of excessive in violation of Johnson's civil rights.")). As set forth *infra*, because neither the undersigned nor the Court attempted to "match" plaintiff's factual allegations with the elements of a failure to (Continued)

The Magistrate Judge conducted an evidentiary hearing on August 13, 2014. (*See* Docket Sheet Entry for August 13, 2014.) Because plaintiff entered a compromise settlement with defendants Kevin Dunn, Penton Ashworth, James Pate, and Roger Marsh prior to the dates set aside for the evidentiary hearing (*see, e.g.*, Doc. 242), the undersigned initially noted that the sole focus of the evidentiary hearing would be the damages the defaulting defendants (Bell and Mummert) owe plaintiff as a result of their failure to intervene and protect plaintiff from the excessive force utilized by defendants Ashworth and Dunn. At the conclusion of the hearing, however, the undersigned informed plaintiff that it was his responsibility to look at the well-pled facts in the complaint and compare those to the specific elements of a failure to intervene claim to determine if entry of a default judgment would be appropriate.[6]

With respect to the issue of damages, plaintiff testified that prior to the December 31, 2010 incident during which Dunn and Ashworth (but primarily Dunn) utilized excessive force, he had good vision in his left eye with no pain and no cataract. In addition, he had no problem with headaches, stress, anxiety, or sleep prior to the incident, nor was he on any medication (including pain medication), other than medication to control his diabetes, prior to the incident.

On December 31, 2010, plaintiff reported to the Shift Office as instructed by Officer Dunn and was informed by Sergeant Ashworth that he was going to placed in a

_____

intervene claim, all that was entered by the undersigned previously was a "default," not a "default judgment."

[6]     The undersigned also questioned counsel regarding whether Bell and Mummert were responsible for all of plaintiff's injuries or only a proportionate amount. Counsel replied that these defendants were jointly and severally liable for all injuries/damages.

one-man cell in the Q-unit because of his high blood sugar.[7] Immediately after Johnson requested to sign a medical refusal form and Ashworth informed plaintiff he could not sign such a form,[8] Ashworth took out his mace and sprayed him in the face. After Dunn also started spraying Johnson with mace, the plaintiff picked up a stool to shield his face. Eventually, Johnson put the stool on the ground and immediately thereafter Ashworth tackled him. As Johnson lay prone on the ground with his arms cuffed behind his back, Dunn got up off the floor, reared back with his leg and kicked plaintiff in the left eye, whereupon plaintiff lost consciousness.[9] Johnson testified that Bell and Mummert were three to five feet in front of him when the incident "jumped off" but then moved to "standing" positions in back of him. Johnson does not recall Bell or Mummert telling Dunn to stop and testified that the cadets did not try to stop Dunn from kicking him in the face.[10]

The Investigative Report, which was marked for identification but not admitted into evidence, concluded that Dunn kicked Johnson and then punched plaintiff in the eye. (*See* Plaintiff's Exhibit 1, at 7-8.) Given that this report reflects Dunn's obvious lack

---

[7]     Johnson at all times relevant hereto has suffered from insulin-dependent diabetes mellitus. (*See, e.g.,* Plaintiff's Exhibit 20, at 0509.)

[8]     Johnson testified that Cadets Bell and Mummert stood a few feet away listening to the conversation he was having with Sergeant Ashworth.

[9]     According to Johnson, Dunn had a reputation among the inmates for fighting inmates and specifically targeting black inmates. In particular, Dunn picked on plaintiff in an attempt to provoke him. Two weeks prior to December 31, 2010, Dunn kicked plaintiff in the "butt" and called him "Diabetic Ho." Johnson offered no testimony, however, establishing that Cadets Bell and Mummert were aware of Dunn's reputation for being a bully towards, or otherwise targeting, black inmates.

[10]     Although Johnson offered such testimony during the evidentiary hearing, he conceded during his deposition that the correctional officers and cadets could have done nothing to prevent Dunn's initial kick. (*See* Doc. 189, Exhibit 2-B, Deposition of David Lee Johnson, at 48.)

9

of credibility (and plaintiff's position that Dunn was not credible in light of his refusal to admit he kicked him), this Court cannot make use of Dunn's admission in the report that he punched plaintiff. However, what the Magistrate Judge believes this Court can take judicial notice of is the deposition testimony of one inmate witness, previously utilized in ruling on other defendants' motion for summary judgment, which establishes that Dunn delivered at least one kick and one closed-fist hit to plaintiff's left eye/face on December 31, 2010. (*See* Doc. 203, at 10 (citing deposition testimony establishing that Dunn kicked plaintiff at least once in the left eye/face and that the correctional office then knelt on plaintiff's neck and punched him in the face with a closed fist).) Indeed, inmate witness Ash-Shakur Shabazz specifically testified that on the date in question Dunn kicked plaintiff in the left eye and then immediately knelt on plaintiff's neck and punched him. (*Compare id. with* Doc. 190, Exhibit 12, Deposition of Ash-Shakur Shabazz, at 15.)

Pictures of Johnson's left eye reflect the obvious trauma sustained by plaintiff (Plaintiff's Exhibit 4)[11] and serve to underscore Johnson's pain complaints, including headache complaints, on and for some period of time after December 31, 2010  (*compare id. with* Plaintiff's Exhibits 11, 14-18 & 23).

At approximately 11:50 a.m. on December 31, 2010, plaintiff was escorted to Holman's Health Care Unit; he was noted to have moderate swelling to the left orbital socket, his eyes were decontaminated, he stated he was unable to read the eye chart, and his pupil would not to respond to light. (*See* Plaintiff's Exhibit 23, at 0022.) Ultimately, a decision was made to transfer plaintiff for treatment in a free world

---

[11]     Johnson testified that these pictures of his eye were taken after Montgomery ophthalmologist, Dr. John A. Jones, first treated him on January 4, 2011 (*see* Plaintiff's Exhibit 22, at 0004).

hospital, that is, North Baldwin Infirmary (*see id.* at 0023); plaintiff was transferred by van at 2:10 p.m. and was admitted to North Baldwin Infirmary at 3:44 p.m. (*id.* at 0002). A CT scan of the brain without contrast was negative, a CT scan of the facial bones revealed soft tissue swelling around the left orbit but no acute facial fracture (*id.* at 0012), and a CT scan of the cervical spine without contrast was normal (*id.* at 0013). Silvadene cream was applied to Johnson's posterior neck and a medication to the left eye. (*Id.* at 0005.) Inasmuch as plaintiff had a massive subconjunctival hemorrhage and decrease in vision (*see id.* at 0006-0007), it was Dr. Walter White's fear that Johnson had a globe rupture (*id.* at 0007); therefore, he recommended plaintiff's transfer to another medical facility for treatment.

Dr. Alan Franklin examined Johnson following his transfer to the Mobile Infirmary Medical Center.[12] (*Compare id. with* Plaintiff's Exhibit 24, at 0010.)[13] Dr. Franklin's impressions, following a thorough examination of both eyes, included the following: (1) traumatic iritis of the left eye; (2) preseptal edema of the left eye; (3) retinal commotio of the left eye; and (4) mild nuclear sclerotic cataract change. (Plaintiff's Exhibit 24, at 0048-0049; *see id.* at 0048 ("Slit-lamp exam of the right eye reveals normal eyelids and lashes, conjunctival melanosis, clear cornea, deep and quiet anterior chamber, and mild nuclear sclerotic cataract. Slit-lamp exam of the left eye reveals chemosis with subconjunctival hemorrhage temporarily and inferiorly. The cornea is clear. The anterior chamber is deep with 1+ cell and flare. The pupil is round.

---

[12]     During the evidentiary hearing, Johnson specifically referred to Dr. Franklin as a "specialist."

[13]     North Baldwin Infirmary billed Blue Cross of Alabama $4,717.40 for services rendered to Johnson on December 31, 2010. (Plaintiff's Exhibit 23, at 0030.) Following a contractual adjustment in the amount of $3,443.70, Blue Cross paid the medical provider $1,273.70. (*Id.*)

The lens shows mild and symmetric **nuclear sclerotic cataract change to the right,** and there is no phacodonesis[14].") Medical personnel at the Mobile Infirmary administered various medications to Johnson and a Fox Shield was placed over plaintiff's left orbital socket. (*See, e.g.,* Plaintiff's Exhibit 24, at 0007 & 0037.) Discharge instructions included Pred Forte drops (one in the left eye four times a day), Atropine sulfate (one drop in the left eye twice a day), Tylenol #3 for eye pain (20 pills with no refill, to be administered every six hours, 1 to 2 pills), and the use of ice packs for 15 minutes every hour for six hours. (*Id*. at 0049.)[15] Dr. Franklin instructed Johnson to return for "[f]ollow[-]up within a week." (Plaintiff's Exhibit 24, at 0049.)[16]

Although there was no evidence offered suggesting that Dr. Franklin ever had any further contact with plaintiff, Johnson was evaluated by Dr. John A. Jones, an ophthalmologist, on January 4, 2011. (*See* Plaintiff's Exhibit 22, at 0004.) Jones confirmed the traumatic iritis diagnosis and recommended a "shades profile" and certain medication. (*See id.*) Plaintiff's traumatic iritis was much improved when Jones saw plaintiff Johnson for follow-up on January 12, 2011; the eye medications were continued, as was plaintiff's "shades profile."  (*Id.* at 0003.)[17] When Dr. Jones last saw

---

[14]     Phacodonesis "is the tremulousness or vibration of the lens with eye movement." http://en.wikipedia.org/wiki/Pharcodonesis (last visited January 8, 2015).

[15]     The prison medical staff at Holman complied with these instructions. (*See* Plaintiff's Exhibit 18, at 000043-000054.)

[16]     The Mobile Infirmary Medical Center billed Blue Cross of Alabama $988.43 for services rendered to Johnson on December 31, 2010 and January 1, 2011. (*See id.* at 0055.) Following a contractual adjustment in the amount of $780.86, Blue Cross paid the medical provider $207.57. (*Id.*)

[17]     Sometime in January of 2011, after plaintiff's Tylenol #3 pain prescription from Dr. Franklin ran out, prison medical personnel began supplying plaintiff with Motrin/Ibuprophen to treat his continued complaints of eye pain. (*See* Plaintiff's Exhibit 17, at (Continued)

Johnson on February 3, 2011, plaintiff's traumatic iritis was resolved and the

ophthalmologist noted that the "shades profile" could be discontinued in one week.

(Plaintiff's Exhibit 22, at 0002;[18] *see also* Plaintiff's Exhibit 33, Deposition of Dr. Allen

Jones, at 22;[19] *cf.* Plaintiff's Exhibit 18, at 000056 (nurse's notation on January 6, 2011,

educating Johnson on the wearing of his shades after he told her he left his sunglasses

in his cell).)

     Johnson testified that he was transferred to Donaldson Correctional Facility in

February of 2011, sometime after he saw Dr. Jones, and at that point came under the

care of Dr.  Michael Hooks, an optometrist (*see, e.g., id.* at  42; *compare id. with* Plaintiff's

Exhibit 25, at 0001). Indeed, the prison medical records reflect that Johnson was

transferred from Holman on February 23, 2011 (Plaintiff's Exhibit 16, at 0072) and the

notes from the nurse reflect that plaintiff had a profile for shades due to his sensitivity

to light (*id.*). Initially upon transfer, the prison medical records are clear that plaintiff

was examined by Dr. Hooks on March 7, 2011 (*see* Plaintiff's Exhibit 25, at 0001), that

---

0057-0065.) During February of 2011, plaintiff continued to receive either Motrin or Tylenol to
address his pain (eye and headache) complaints. (*See* Plaintiff's Exhibit 16, at 0066-0074.)

[18]     Correctional Medical Services ("CMS") apparently paid Dr. Jones a total of  at
least $271.00, if not $342.00, for his treatment of Johnson. (*See* Plaintiff's Exhibit 25, at 0032-0037.)

[19]     Dr. Jones testified during his August 9, 2012 deposition that when he first
examined Johnson on January 4, 2011, he did not note any damage to the lens of plaintiff's left
eye (*see id.* at 14; *compare id. with id.* at 23-24 (explaining that a cataract is an opacity or
discoloration of the lens of the eye)) and later testified that on Johnson's second visit on January
12, 2011, no cataract was seen in Johnson's left eye (*id.* at 19; *compare id. with id.* at 24 & 34 (Dr.
Jones testimony that during his treatment of Johnson, he saw no evidence of a cataract in the left
eye, as the lens was clear)). According to Jones, trauma (like a kick in the eye) can cause a
cataract to develop gradually over the course of a year or longer, while, with diabetes, a cataract
can develop within weeks. (*Id.* at 27.) Moreover, it was Jones' testimony that the "development
of a cataract after trauma to an eye is consistent with the trauma being a significant factor in the
cataract formation." (*Id.* at 41.) Finally, Jones testified, based upon counsel's representation that
Dr. Hooks' diagnosed plaintiff with a cataract in his left eye one year after Jones last saw
plaintiff, there is  "good possibility[]" that the trauma caused the cataract. (*Id.* at 42.)

Hooks noted that the traumatic iritis was resolved, and that Visine AC drops were ordered for a period of 60 days (*see* Plaintiff's Exhibit 11, at 0082-0087; Plaintiff's Exhibit 12, at 01050107; Plaintiff's Exhibit 14, at 0099-0101; and Plaintiff's Exhibit 15, at 0075-0080). During this time (that is, March 2011 through May 2011), the medical staff at Donaldson addressed plaintiff's complaints of eye pain and headaches with Motrin (400 mgs). (*See id.*)

Dr. Hooks examined plaintiff one additional time in 2011, on October 27, 2011 (*see* Plaintiff's Exhibit 25, at 0007), and twice during 2012, on March 29, 2012 and August 16, 2012 (*see id.* at 0002 & 0006). During the March 29, 2012 examination, and again during the August 16, 2012 examination, Dr. Hooks noted the presence of a nuclear sclerotic cataract, apparently on plaintiff's left eye. (*See id.*; *compare id. with* Plaintiff's Exhibit 20, at 0505-0509.) The prison medical records supplied by plaintiff reflect that beginning in July of 2012 through March of 2013, Johnson continued to complain of headaches, eye pain, blurred vision, and sensitivity to light (*compare* Plaintiff's Exhibit 20 *with* Plaintiff's Exhibits 31 & 32); treatment included Pred Forte steroid drops[20] and Motrin (*see id.*).[21]

Plaintiff testified during the August 13, 2014 evidentiary hearing that he saw a Dr. Tylell (or Tyndell) at Donaldson because of nightmares and panic attacks brought

---

[20]   Dr. Bradford, an optometrist, prescribed the Pred Forte drops on January 2, 2013. (Plaintiff's Exhibit 20, at 0509.) At that time, Dr. Bradford described Johnson's cataract as a mild nuclear sclerotic cataract. (*Id.*)

[21]   Johnson's sunglasses were not taken from him after his transfer to Donaldson, nor was his "shades" profile ever rescinded after his arrival at Donaldson, despite Dr. Jones' unequivocal direction on February 2, 2011, that plaintiff's "shades profile" could be discontinued in one week.

on by the assault;[22] however, plaintiff offered into evidence no medical records related to such treatment.

As of the date of the hearing, plaintiff contends he continues to receive pain medication (Mobic) and Visine drops for continued problems (including blurring vision) associated with his left eye. In addition, plaintiff testified he still experiences headaches once every two weeks which are resolved with pain medication.

Plaintiff seeks compensatory damages, including $6,423.83 in past medical bills, $5,000.00 in future medical bills for cataract surgery,[23] $25,296.00 for loss of vision based upon Alabama Code §§ 25-5-57(a)(3)a.17. and 25-5-68,[24] and damages for pain and suffering and mental anguish,[25] as well as punitive damages. In addition, plaintiff seeks the recovery of attorneys' fees and costs associated with this action.

In an order dated August 15, 2014, the undersigned extended to plaintiff the opportunity "to file a motion for default judgment as to Cadet Donald Bell on the basis of the amended complaint which was served on Bell and contains the claim upon which plaintiff seeks to predicate damages[]" inasmuch as plaintiff's initial *pro se* complaint

---

[22]    According to plaintiff, he met one-on-one with the doctor for a few months and then began receiving treatment in a group setting.

[23]    Even if the Court disagrees with the undersigned's analysis set forth *infra*, plaintiff would not be entitled to recover the estimated cost of future cataract surgery from Bell and Mummert in light of the Dr. Franklin's unequivocal notation on December 31, 2010 that there was nuclear sclerotic cataract change to the right side of plaintiff's left eye.

[24]    The Alabama Code sections plaintiff makes reference to are applicable to worker's compensation cases, *compare* Ala.Code § 25-5-57 *with* § 25-5-58, and since this case is obviously not a worker's compensation, plaintiff is entitled to no damages for "loss of vision." Moreover, plaintiff has not suffered the "loss of an eye" as referenced in § 25-5-57, only (as admitted) a decrease in vision. Therefore, even if these worker's compensation provisions were applicable to his case, plaintiff would be entitled to no damages because he did not suffer the loss of his left eye.

[25]    Plaintiff made no specific demand for damages due to pain and suffering.

did not specifically assert a failure to intervene claim against Cadet Bell (*see* Doc. 1) and the Court's granting of default in plaintiff's favor as to Bell was based on the initial complaint. (*See* Doc. 240, at 1-2.) The plaintiff filed another motion seeking a default judgment against Cadet Bell (Doc. 241); therein, however, plaintiff avers that the allegations in his original complaint, more specifically in his affidavit attached to the complaint, sufficiently apprised Bell of a failure to intervene claim, such that the default judgment entered against Bell on July 12, 2012 is sufficient for purposes of awarding him damages against Bell (*see id.* at 1-2 & n.1). And while there can be no question but that this Court could liberally construe plaintiff's *pro se* complaint (that is, his affidavit) as asserting a failure to intervene claim, *cf. Terry v. Bailey*, 376 Fed.Appx. 894, 896 n.3 (11th Cir. Apr. 27, 2010) ("Although it is unclear if Terry intended to bring a failure to intervene claim, we construe his complaint liberally and address the claim accordingly."),[26] the problems that plaintiff faces in attempting to rely solely on the original complaint are many. First, the original complaint contains no assertion that Bell (or Mummert, for that matter) failed to intervene to protect him from Ashworth spraying him with the chemical agent[27] and, therefore, any such claim against Bell related to Ashworth's discharges of the chemical agent immediately "fails." As for Dunn's actions, there can be no question but that this defendant's actions in kicking and punching plaintiff while Johnson was secured facedown on the ground with handcuffs was excessive force; however, nothing in the complaint factually establishes that Bell

---

[26]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

[27]    Indeed, plaintiff sets forth no facts from which this Court could find that Bell (or Mummert) were in a position to stop Ashworth from spraying him with the chemical agent Sabre Red. (*See* Doc. 1, Affidavit.)

(or, again, Mummert) knew Dunn was going to use excessive force before Dunn kicked Johnson in the face. Therefore, at best, plaintiff's original complaint establishes only that Bell (and Mummert) were in positions to intervene after delivery of that initial kick, that is, to stop Dunn from punching plaintiff in the face. The problem with reaching this conclusion, however, based on the original complaint—which is based solely on plaintiff's "testimony"—is that this Court now knows, unquestionably, by Johnson's testimony during the evidentiary hearing, that after Dunn reared back and kicked him in the eye he lost consciousness. Thus, plaintiff's direct allegation in the initial complaint that Dunn punched him in the eye is entitled to no credence because Johnson never witnessed this punch and, without such allegation against Bell, plaintiff's default judgment against Bell on the basis of the initial complaint avails him of nothing inasmuch as there has never been any suggestion by this Court that any of the defendants were in a position to stop Dunn's initial kick (*see, e.g.*, Doc. 214, at 23 ("[T]here is testimony from the plaintiff and other inmate witnesses that the defendants could have taken some action after Dunn's initial kick, but took no action to physically stop Dunn or to order Dunn to stop.")), nor, as aforesaid, any facts in the original complaint establishing that Bell (or Mummert) knew that Dunn was going to use excessive force before the kick was delivered.[28]

Given plaintiff's assertion during the evidentiary hearing that he was seeking an award of attorneys' fees and costs against Bell and Mummert, the undersigned ordered plaintiff to file his motion for an award of attorneys' fees and costs by a date certain so that a discussion of reasonable fees and costs could be made part and parcel of the

---

[28]    In other words, it was only upon delivery of the initial kick that the defendants could have realized Dunn was utilizing excessive force against Johnson.

instant report and recommendation. (*See* Doc. 240, at 2-3.) Plaintiff filed his initial

motion for an award of attorneys' fees and costs on September 10, 2014 (Doc. 244) and

then filed his supplemental motion on November 4, 2014 (Doc. 246).

## CONCLUSIONS OF LAW

**A.   Default Judgment Standard**.  The law is clear in the Eleventh Circuit that

"a default is not 'an absolute confession by the defendant of his liability and of the

plaintiff's right to recover,' but is instead merely 'an admission of the facts cited in the

Complaint, which by themselves may or may not be sufficient to establish a defendant's

liability.'" *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Edmonds,* 2010 WL 761332, *3 (S.D. Ala.

Mar. 3, 2010), quoting *Pitts ex rel. Pitts v. Seneca Sports, Inc.,* 321 F.Supp.2d 1353, 1357

(S.D. Ga. 2004) (other citations omitted).

> In considering a motion for entry of default judgment, a court must investigate the legal sufficiency of the allegations of the plaintiff's complaint. That is, a default judgment cannot stand on a complaint that fails to state a claim. A default judgment has the effect of establishing as fact the plaintiff's well-pleaded allegations of fact, and bars the defendant from contesting those facts on appeal.[29] The defendant, however, is not held to admit facts that are not well-pleaded or to admit conclusions of law.
>
>         Finally, in considering a motion for default judgment, a court may also consider evidence presented at a hearing on the motion for default judgment, or other evidence in the record.

*Functional Products Trading, S.A. v. JITC, LLC,* 2014 WL 3749213, *11-12 (N.D. Ga. Jul. 29,

2014) (internal quotation marks, citations, and brackets omitted; footnote added); *see*

*Evanston Ins. Co. v. Larcon Corp.,* 2009 WL 1370811, *1 (M.D. Fla. May 14, 2009) ("The

effect of the entry of a default is that all of the factual allegations in the Complaint are

---

[29]      As observed by the former Fifth Circuit in *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank,* 515 F.2d 1200 (1975), "[a] default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." *Id.* at 1206.

taken as true, save for the amount of unspecified damages. Thus, if liability is well-plead in the complaint, it is established by the entry of a default. A court may enter a default judgment only if the factual allegations of the complaint provide a sufficient legal basis for entry of a default judgment." (internal citations omitted)).

As alluded to earlier, when the undersigned entered the previous report and recommendations (Docs. 104 & 185) based on the plaintiff's initial motion for default judgment as to defendant Bell (Doc. 99) and his motion for default judgment as to defendant Mummert (Doc. 179), and the Court entered its defaults as to Bell and Mummert (*see* Docs. 110 & 197[30]), there was no "investigation" into the legal sufficiency of the allegations of plaintiff's initial complaint or his complaint as amended. Because, however, the Court's previous actions merely amounted to entries of "default" as opposed to entries of default judgment, *Chudasama, supra,* the instant report and recommendation is the proper venue by which to recommend whether default judgment should be entered against the defaulting defendants upon an investigation into the legal sufficiency of the allegations of plaintiff's complaint, as amended[31].[32]

The undersigned finds that to the extent David Lee Johnson has stated a cause of action against defendants Bell and Mummert for failure to intervene he has done so

---

[30]    *Cf. Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1365 n.27 (11th Cir. 1997) ("There can be no 'judgment' without a determination of relief. Thus, the document entitled 'default judgment' in this case is more properly termed simply a 'default.'").

[31]    The undersigned reiterates that although the plaintiff filed a second amended complaint on October 1, 2012, the claims asserted in the second amended complaint are identical to those raised in the first amended complaint. (*Compare* Doc. 155 *with* Doc. 111.)

[32]    To the extent plaintiff maintains that he be allowed to "stand" on his initial complaint as establishing Bell's liability for failure to intervene (*see* Doc. 21, at 1-2 & n.1), the undersigned would simply recommend that the Court **DECLINE** to enter default judgment against Bell in any amount for the reasons previously explained and those to be explained *infra.*

only as it relates to Ashworth's second discharge of the chemical agent Sabre Red and Dunn's close-fisted punch to plaintiff's face.[33] To state a claim of failure to intervene, or nonfeasance, a plaintiff must show that an officer (1) observed or had reason to know that excessive force would be or was being used by another officer, and (2) fails to take reasonable steps to protect the victim when he is in a position to intervene. *Compare Terry, supra,* 376 Fed.Appx. at 896 ("Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence. However, in order for liability to attach, the officers must have been in a position to intervene." (internal citation omitted)); *Campbell v. Harvill,* 2012 WL 928607, *5 (M.D. Ga. Feb. 15, 2012) ("To be held liable for his nonfeasance, an officer (1) must have observed or had reason to know that excessive force would be or was being used, and (2) must have had both the opportunity and the means to prevent harm from occurring."), *report and recommendation adopted,* 2012 WL 929614 (M.D. Ga. Mar. 19, 2012); and *Connell v. Tate,* 2012 WL 252817, *13 (M.D. Fla. Jan. 25, 2012) ("The facts, as alleged, show that Defendant Esford violated a constitutional right, failing to intervene when Plaintiff was being beaten by correctional officers when Esford was in a position to intervene.") *with Detris v. Coats,* 523 Fed.Appx. 612, 616 (11th Cir. Jul. 11, 2013) ("As we have held, an officer may be liable under § 1983 for failing to intervene and stop another officer's use of excessive force. However, for an officer to be liable for failing to

---

[33]     In light of the analysis set forth hereinafter, there is a substantial question in the undersigned's mind whether plaintiff has alleged a constitutional violation by Bell and Mummert or come forward with evidence of a constitutional violation by the defaulting defendants. If the Court ultimately determines there was no constitutional violation by Bell and Mummert, of course, no damages (nominal or otherwise) are awardable and plaintiff would not be a prevailing party for purposes of an award of attorneys' fees, *see* 42 U.S.C. § 1988.

stop police brutality, the officer must be in a position to intervene." (internal citations and quotation marks omitted)); *Crenshaw v. Lister,* 556 F.3d 1283, 1293-1294 (11th Cir. 2009) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance. However, it must also be true that the non-intervening officer was in a position to intervene yet failed to do so." (internal citations and quotation marks omitted)); and *Montanez v. Celaya,* 2014 WL 4437273, *7 (M.D. Fla. Sept. 8, 2014) ("An officer has a duty to intervene to stop the use of excessive force if: (1) he is in a position to do so and (2) refuses to do so.").

Johnson identically alleges in his first and second amended complaint that Bell and Mummert were present for and witnessed the excessive force applied to him by Dunn and Ashworth, yet failed to take steps to protect him from that excessive force even though they had a realistic opportunity to do so. (*Compare* Doc. 111, at ¶¶ 21, 35 & 37 *with* Doc. 155, at ¶¶ 22, 36 & 38.) Plaintiff also alleges that Dunn kicked and punched him in the head while he was handcuffed on the ground and that Ashworth twice sprayed him with Sabre Red, the first discharge coming without warning, provocation or reason. (*Compare* Doc. 111, at ¶¶ 18 & 31 *with* Doc. 155, at ¶¶ 19 & 32.) Johnson specifically alleges the "[d]efendants had the opportunity to prevent Dunn from kicking and punching Plaintiff but failed to do so." (*Compare* Doc. 111, at ¶ 21 *with* Doc. 155, at ¶ 22.) Finally, plaintiff avers that "[p]rior to and while working at Holman Correctional Facility, Dunn had a reputation for violent behavior, particular[ly] towards African-American inmates, and Defendants knew or should have known of Dunn's propensity to physically harm inmates." (*Compare* Doc. 111, at ¶ 29 *with* Doc. 155, at ¶ 30.) Plaintiff "bases" this reputation allegation upon various incidents occurring prior to December 31, 2010, as follows: (1) while Dunn was working at Fountain Correctional Facility he

21

was involved in a fight with an African-American correctional officer; (2) during a cell extraction at Holman, Dunn hit the African-American inmate in the head with his fist while the inmate was on the ground;[34] and (3) while working for the City of Atmore Police Department, Dunn was involved in a physical altercation leading to his resignation. (*Compare* Doc. 111, at ¶ 28 *with* Doc. 155, at ¶ 29.)

The undersigned concludes that the identical allegations in the first and second amended complaints are sufficient, at best, to entitle plaintiff to a default judgment against Bell and Mummert to the extent his failure to intervene claims seek to recover for the second burst of Sabre Red from Ashworth's canister of chemical agent and for the punch to plaintiff's face/left eye delivered by Dunn. The undersigned need note that, in general, the allegations contained in plaintiff's first and second amended complaint are conclusory as they relate to the legal elements of a failure to intervene claim and are truly not based upon many well-pled facts. For instance, not only does plaintiff not factually establish exactly where Bell and Mummert were positioned upon Ashworth's first discharge of Sabre Red, his allegation that the initial discharge was "[w]ithout warning" applies equally to Bell and Mummert as it does to Johnson. Moreover, there are no facts in the first and second amended complaints which even begin to suggest that Bell and Mummert had reason to know before the first discharge of Sabre Red that Ashworth would utilize excessive force against Johnson. Accordingly, based upon the allegations of the complaint, as amended, Bell and Mummert were certainly not in a position to stop  the first discharge of Sabre Red and could only have appreciated that excessive force was being utilize upon the initial discharge of chemical

---

[34]     "Sergeant Penton Ashworth witnessed the incident." (*Compare* Doc. 111, at ¶ 28.b. *with* Doc. 155, ¶ 29.b.)

agent by Ashworth. Therefore, at best, the first and second amended complaints allege a failure to intervene claim against Bell and Mummert as it relates to the second burst of Sabre Red from Ashworth's canister of mace.

Turning to Dunn's actions of kicking and punching Johnson, the undersigned is at once struck by plaintiff's failure to factually describe exactly where and how Bell and Mummert were positioned when Dunn utilized excessive force and whether the kick or punch arrived first. Instead, plaintiff launches into conclusory statements that all defendants were in positions to intervene and stop Dunn but failed to do so. However, if, as the complaint allegations suggest, Bell and Mummert were "pinning" plaintiff to the ground when Dunn utilized excessive force (*see, e.g.,* Doc. 155, at ¶¶ 21-22), there is just as much reason to believe that the defaulting defendants did not see Dunn kick plaintiff—presumably the kick came first since the first and second amended complaints consistently make reference to "kicking" before "punching"—as to believe that these defendants saw the kick. Moreover, there are no facts contained in the complaints which establish that Bell and Mummert had reason to know that Dunn would utilize excessive force against Johnson. To be sure, plaintiff conclusorily alleges that "[p]rior to and while working at Holman Correctional Facility, Dunn had a reputation for violent behavior, particular[ly] towards African-American inmates, and ***Defendants*** knew or should have known of Dunn's propensity to physically harm inmates." (*See, e.g.,* Doc. 155, at ¶ 30 (emphasis supplied).) However, the facts plaintiff utilizes to support this conclusory allegation (*see, e.g.,* Doc. 155, at ¶ 29.a.-c.) give no suggestion that Cadets Bell and Mummert, that is, correctional-officers-in-training, knew that Dunn was involved in a fight with a fellow correctional officer at Fountain Correctional Facility, hit another inmate in the head during a cell extraction while the inmate was on the ground, or that he had a physical altercation while employed as a

policeman with the City of Atmore, such that they had reason to know Dunn would utilize excessive force against Johnson. There being no facts which tie Bell and Mummert to knowledge that excessive force would be utilized by Dunn before he actually engaged in unconstitutional conduct, at best, plaintiff's first and second amended complaint allege a failure to intervene claim with respect to the second blow (implicitly, the punch) delivered by Dunn to plaintiff's face.[35]

---

[35]   Of course, such finding is a bit of a stretch given plaintiff's failure to specifically describe the sequence of blows or how the positioning of Bell and Mummert allowed them to witness the first unconstitutional blow in order to stop the second blow.

Although consideration of plaintiff's evidentiary hearing tends to clear up a few matters, it does so at the expense of the allegations in the first and second amended complaint. For instance, plaintiff states that Bell and Mummert ended up in "standing" positions behind him when he was taken to the ground (contrary to the complaint allegations which place Bell and Mummert on top of Johnson pinning him to the ground), such that the defaulting defendants had a good view of Dunn when he was kicked in the face and lost consciousness. However, plaintiff's testimony that Bell and Mummert did nothing to try to stop Dunn from kicking him in the face is not only conclusory but establishes nothing inasmuch as Johnson offered no facts establishing that Bell and Mummert knew or could have known that Dunn would use excessive force against him until Dunn, in fact, delivered the kick to his face. Indeed, if this Court can consider plaintiff's evidentiary hearing testimony, it can also consider other evidence in the record, *see Functional Products Trading, S.A., supra,* at 12, including the deposition testimony of Johnson and inmate James Earl Pittman; Johnson begrudgingly conceded that none of the officers could have prevented Dunn's initial kick because they did not know it was coming (*see* Doc. 189, Exhibits 2A & 2B, Deposition of David Lee Johnson, at 40-43 & 48) and Pittman testified that he did not believe any of the other officers knew Dunn was going to kick Johnson (Doc. 190, Exhibit 11, Deposition of James Earl Pittman, at 28). Thus, again, at best, plaintiff has only alleged a cause of action against Bell and Mummert for failure to intervene as it relates to the punch Dunn delivered to plaintiff's face which, of course, plaintiff did not see due to the fact that he was temporarily knocked unconscious by the kick.

There is simply nothing about the allegations contained in plaintiff's first and second amended complaints, or plaintiff's evidentiary hearing testimony, that dissuades the undersigned from the position outlined on the other defendants' motion for summary judgment that the unconstitutional action taken by Dunn after the initial kick (that is, the punch) is the only excessive force which Bell and Mummert could have seen and were possibly in a position to intervene and prevent. (*Compare* Doc. 203, at 29 ('[T]here is testimony from plaintiff and other inmate witnesses that the moving defendants could have taken some action after Dunn's initial kick but took no action to physically stop Dunn, nor did any of the aforementioned three defendants order Dunn to stop the assault.")  *with* Doc. 214, at 23 ("[T]here is testimony from the plaintiff and other inmate witnesses that the defendants could have taken some action after Dunn's initial kick, but took no action to physically stop Dunn or to order Dunn to stop.").)

In light of the foregoing analysis, the undersigned next considers whether Johnson is entitled to recover any damages from Bell and Mummert. *See Pennsylvania Nat'l Mut. Cas. Ins. Co., supra,* at *4.

**B.      Has Plaintiff Offered Proof Entitling Him to Recover Damages from Bell and Mummert Based Upon their Failure to Intervene and Prevent Dunn from Punching Him and their Failure to Intervene and Prevent Ashworth from Spraying Him with Sabre Red the Second Time**.

In general, it is clear that where, as here, the amount of damages is not certain, this Court may only enter a default judgment "after conducting a hearing to determine the amount of damages." *Campbell v. Humphries,* 353 Fed.Appx. 334, 337 (11th Cir. Nov. 20, 2009), citing Fed.R.Civ.P. 55(b)(2)(B) and *S.E.C. v. Smyth,* 420 F.3d 1225, 1231-1232 (11th Cir. 2005); *see also Chanel, Inc. v. Louis,* 2009 WL 4639674, *11 (E.D. N.Y. Dec. 7, 2009) ("[The defendant's] default does not relieve the plaintiffs of their burden of proving their damages to a 'reasonable certainty.'"); *Evanston Ins. Co., supra,* at *1 ("If the amount of damages sought are not specified in the complaint, Plaintiff must prove up the unliquidated sums, in a hearing on damages or otherwise."); *cf. Adorn, LLC v. Lakeside Park Homes, Inc.,* 2007 WL 640290, *1 (M.D. Ga. Feb. 26, 2007) ("Damages are 'sum certain' when they are for a liquidated amount."). "As for the specific amount awarded after the evidentiary hearing, 'the district court has a great deal of discretion in deciding the level of damages to be awarded.'" *Campbell, supra,* 353 Fed.Appx. at 337, quoting *Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir. 1985).

As for damages related to the defaulting defendants' failure to intervene to protect plaintiff from Ashworth and Dunn, the undersigned need recommend that the plaintiff be awarded no damages. This is because plaintiff first failed to offer any evidence establishing that Bell and Mummert knew that Ashworth would utilize

excessive force against him; rather, both defendants simply observed the "alleged" excessive force upon Ashworth's first "spray" and were, therefore, only in a position to possibly prevent the second burst of spray from Ashworth's Sabre Red. Indeed, plaintiff clearly stated in his complaint that the first discharge was "[w]ithout warning[ or] provocation[;]" (*see, e.g.,* Doc. 155, at ¶ 19); if it was, as plaintiff alleges, without warning to him, it obviously was without warning to Bell and Mummert. Additionally, as alluded to earlier, plaintiff offered absolutely no evidence that Bell and Mummert were aware of Dunn's propensity for violence against inmates—particularly African-American inmates—and that they were anything but surprised by Dunn's initial kick to plaintiff's left eye, as opposed to the punch, which plaintiff claims they could have prevented. More important than any of the foregoing is that plaintiff offered absolutely no evidence that the second burst of Sabre Red from Ashworth did any damage over and above the initial burst of the chemical agent,[36] or that Dunn's punch to the eye did any damage over and above the damage wrought by Dunn's kick.[37] Accordingly, given

---

[36] Indeed, the evidence offered tends to suggest that the second burst caused no additional damage given Johnson's testimony, as well as the allegations in the first and second amended complaint, that after the initial burst of the chemical agent, he picked up a wooden stool to shield himself from the chemical agent and dropped the stool when Ashworth stopped spraying the chemical agent.

[37] The evidence offered—including plaintiff's testimony that Dunn "reared back" and kicked him and that he lost consciousness as a result of the kick—establishes that the lion's share (if not all) of the damage to plaintiff's eye is attributable to Dunn's kick. Therefore, it would be mere speculation for the undersigned to attempt to attribute any of the damage plaintiff suffered to the punch which Bell and Mummert were in a position to prevent. The undersigned **DECLINES** to so speculate since plaintiff was required to "prove up [all] unliquidated sums[.]" *See Evanston Ins. Co., supra,* at *1.

Johnson's failure of proof in this regard, he is not entitled to recover any damages (nominal[38] or otherwise) from the defaulting defendants, Bell and Mummert.

### C.   Are Attorneys' Fees and Costs Recoverable from Bell and Mummert?

Plaintiff seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b) (*see* Doc. 244, at 1) and there can be little question but that to be entitled to attorneys' fees under § 1988, "a plaintiff must be a 'prevailing party.'" *Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 572, 121 L.Ed.2d 494 (1992).

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The claimant must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party. In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Id.* at 111-112, 113 S.Ct. at 573 (internal citations, quotation marks, and brackets omitted). The Supreme Court in *Farrar* ultimately concluded that "a plaintiff who wins nominal damages is a prevailing party under § 1988." *Id.* at 112, 113 S.Ct. at 573; *see also id.* at 113, 113 S.Ct. at 574 ("A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.").

---

[38]      Plaintiff has never made a request for nominal damages (*compare* Doc. 155 *with* Doc. 111); therefore, he has waived any entitlement to such damages. *Cf. Oliver v. Falla,* 258 F.3d 1277, 1282 (11th Cir. 2001) ("[T]he request for nominal damages is not automatic in an Eighth Amendment excessive force case. The plaintiff must seek such damages, and if he fails to do so, he waives any entitlement to such damages."), *cert. denied,* 535 U.S. 906, 122 S.Ct. 1207, 152 L.Ed.2d 145 (2002).

Here, of course, the undersigned is recommending that no damages be awarded plaintiff against Bell and Mummert due to a failure of proof on plaintiff's part. Therefore, because plaintiff has not obtained an enforceable judgment against Bell and Mummert—that is, a judgment which will modify the defaulting defendants' behavior for the plaintiff's benefit by forcing the defendants to pay amounts of money they otherwise would not pay—he is not a "prevailing party" for purposes of § 1988 and the motion for attorneys' fees (Doc. 244), as amended (Doc. 246), is due to be **DENIED**.

<u>CONCLUSION</u>

Based upon the foregoing, the undersigned recommends that the Court find that plaintiff should have and take nothing from the defaulting defendants. Moreover, it is recommended that the motion for an award of attorneys' fees (Doc. 244), as amended (Doc. 246), be **DENIED** because plaintiff is not a prevailing party under § 1988.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's *factual findings.*" *Dupree v. Warden,* 715 F.3d 1295, 1300 (11th Cir. 2013) (emphasis in original). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by

28

reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 27th day of January, 2015.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**